STATE OF NORTH CAROLINA v. DWIGHT LAMONT ROBINSON

No. 273A92

(Filed 6 May 1994)

**1. Jury § 260 (NCI4th) — peremptory challenges of black jurors — reasons offered by State**

Although the reasons offered by the State in support of its decision to exercise a peremptory challenge need not rise to the level of justifying the exercise of a challenge for cause, they must demonstrate that the prosecutor was not excluding jurors on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.

**Am Jur 2d, Jury § 235.**

**Racial or ethnic prejudice of prospective jurors as proper subject of inquiry or ground of challenge on voir dire in state criminal case. 94 ALR3d 15.**

**2. Jury § 256 (NCI4th) — peremptory challenges — racial discrimination — factors considered**

Factors to which the Supreme Court has looked to help determine the existence or absence of purposeful discrimination in the prosecution's use of peremptory challenges include (1) the susceptibility of the particular case to racial discrimination; (2) whether similarly situated whites were accepted as jurors; (3) whether the State used all of its peremptory challenges; (4) the race of the witnesses in the case; (5) whether the early pattern of strikes indicated a discriminatory intent; and (6) the ultimate makeup of the jury. In addition, an examination of the actual explanations given by the district attorney for challenging black veniremen is a crucial part of testing defendant's claim of racial discrimination, and it is satisfactory if these explanations have as their basis a "legitimate hunch" or "past experience" in the selection of juries.

**Am Jur 2d, Jury § 235.**

**Racial or ethnic prejudice of prospective jurors as proper subject of inquiry or ground of challenge on voir dire in state criminal case. 94 ALR3d 15.**

3. **Jury § 256 (NCI4th) — peremptory challenges — racial discrimination — appellate review**

When evaluating the prosecutor's stated reasons for the use of peremptory challenges, the ultimate question to be decided by the trial court is whether the prosecutor was exercising his peremptory challenges with a discriminatory intent. Evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within the trial judge's province, and the findings of the trial judge are not to be overturned unless the appellate court is convinced that the judge's determination was clearly erroneous.

**Am Jur 2d, Jury § 235.**

**Racial or ethnic prejudice of prospective jurors as proper subject of inquiry or ground of challenge on voir dire in state criminal case. 94 ALR3d 15.**

4. **Jury § 260 (NCI4th) — peremptory challenge — showing of race-neutral reasons**

The prosecutor did not use his peremptory challenge of a black prospective juror in a capital resentencing proceeding in a discriminatory manner where the prosecutor stated that he challenged this juror because she was a liberal arts teacher, had a master's degree in education, and her husband had been a teacher for twenty years; she had a male child sixteen years old and would have sympathy for the defendant; she answered some questions with her arms folded and did not answer in a very direct manner; and he did not feel that she would be fair and impartial toward the State.

**Am Jur 2d, Jury § 235.**

**Racial or ethnic prejudice of prospective jurors as proper subject of inquiry or ground of challenge on voir dire in state criminal case. 94 ALR3d 15.**

5. **Jury § 260 (NCI4th) — peremptory challenge — showing of race-neutral reasons**

The prosecutor did not use his peremptory challenge of a black prospective juror in a capital resentencing proceeding in a discriminatory manner where the prosecutor stated that he challenged the juror because she had stated that she was eager to attend her granddaughter's college graduation on

STATE v. ROBINSON

[336 N.C. 78 (1994)]

Thursday; she had back problems that she mentioned in response to the prosecutor's question whether anyone on the jury had any problems that would interfere with his or her service as a juror; she had a male child twenty-eight years of age and another forty-one years of age; when asked if she had ever been a witness in a civil case, she confused being a witness with being a juror; she listed her age as fifty-nine but appeared to the prosecutor to be much older than that; and the prosecutor thought that, given her age, her family obligations, the male children in her family, and her somewhat confused state in answering questions, she would not be a completely fair and impartial juror in the case.

**Am Jur 2d, Jury § 235.**

**Racial or ethnic prejudice of prospective jurors as proper subject of inquiry or ground of challenge on voir dire in state criminal case. 94 ALR3d 15.**

6. **Jury § 260 (NCI4th) — peremptory challenge — showing of race-neutral reasons**

The prosecutor did not use his peremptory challenge of a black prospective juror in a capital resentencing proceeding in a discriminatory manner where the prosecutor stated that he challenged the juror because she had lived at the same address for three months but had trouble remembering her other address; she could not remember the name of the trucking company for which her husband had worked for three years; she had a male child seventeen years old, and the prosecutor believed that members of her family had been in trouble in the City of High Point; her lack of attention to detail would make her unable to retain the evidence. that was to come forward; and her family relations and the age of her son would cause her to sympathize with the defendant.

**Am Jur 2d, Jury § 235.**

**Racial or ethnic prejudice of prospective jurors as proper subject of inquiry or ground of challenge on voir dire in state criminal case. 94 ALR3d 15.**

7. **Jury § 260 (NCI4th) — peremptory challenge — showing of race-neutral reasons**

The prosecutor did not use his peremptory challenge of a black prospective juror in a capital resentencing proceeding

in a discriminatory manner where the prosecutor stated that he challenged the juror because she had a pending court appearance for DWI which would be prosecuted by the district attorney's office; the juror had stated that she would hold the State to a higher burden of proof in a death penalty case; and when asked if she had any strong leanings, she stated that she leaned toward life and that she did not think she could impose the death penalty.

**Am Jur 2d, Jury § 235.**

**Racial or ethnic prejudice of prospective jurors as proper subject of inquiry or ground of challenge on voir dire in state criminal case. 94 ALR3d 15.**

8. **Jury § 260 (NCI4th) — peremptory challenge — showing of race-neutral reasons**

The prosecutor did not use his peremptory challenge of a black prospective juror in a capital resentencing proceeding in a discriminatory manner where the prosecutor stated that he challenged the juror because the juror equivocated on her position on capital punishment and her leanings were toward life imprisonment; the juror was separated from her husband and had a male child near the age of defendant; and the prosecutor felt that defendant would probably present evidence of a broken home full of abuse and that "based on [the prosecutor's] eleven years of picking juries, in [his] opinion this woman would have never voted for capital punishment in this particular case or in any particular case."

**Am Jur 2d, Jury § 235.**

**Racial or ethnic prejudice of prospective jurors as proper subject of inquiry or ground of challenge on voir dire in state criminal case. 94 ALR3d 15.**

9. **Jury § 260 (NCI4th) — peremptory challenge — showing of race-neutral reasons**

The prosecutor did not use his peremptory challenge of a black prospective juror in a capital resentencing proceeding in a discriminatory manner where the prosecutor stated that he challenged the juror because the juror answered "yes" in response to a jury questionnaire inquiry as to whether he was presently "employed, unemployed, or retired"; this response

STATE v. ROBINSON

[336 N.C. 78 (1994)]

indicated a lack of ability to comprehend or a lack of attention to detail that would not make him a good juror; the juror had a pending DWI charge with a court date within two weeks; the juror had been convicted for nonsupport of illegitimate children and had been back to court three times since that conviction for failure to comply with court orders; the prosecutor's office had been presenting evidence against this juror for the past five years; and the juror was almost the same age as the defendant.

**Am Jur 2d, Jury § 235.**

**Racial or ethnic prejudice of prospective jurors as proper subject of inquiry or ground of challenge on voir dire in state criminal case. 94 ALR3d 15.**

10. **Jury § 148 (NCI4th)— capital sentencing—jury voir dire— questions about consideration of life sentence—objections sustained as to form—exclusion harmless**

The trial court properly sustained as to form defense counsel's questions to prospective jurors in a capital resentencing proceeding as to (1) whether, under the factual situation he had explained to them, they would have any trouble giving, if the evidence and mitigating circumstances so warranted, defendant life imprisonment, or whether they would be prone to give the defendant the death penalty, and (2) whether, under the facts that he had stated in an uninterrupted, rambling recitation of hypothetical facts, the jurors could vote for life imprisonment if they found the mitigating circumstances were sufficient to outweigh the aggravating circumstances. The first question was not properly phrased, was too broad and could properly be viewed as an attempt to indoctrinate prospective jurors, the hypothetical nature and phrasing of both questions improperly tended to cause jurors to pledge themselves to a decision in advance of the evidence, and the questions were objectionable as ambiguous compound questions that created a likelihood of confusing the jury. Assuming, *arguendo*, that the trial court was required by *Morgan v. Illinois*, --- U.S --- , 119 L. Ed. 2d 492 (1992) to allow these particular questions, any error in excluding them was rendered harmless by the fact that defendant was allowed to satisfy his inquiry through further use of *voir dire* by himself and by the trial court.

**Am Jur 2d, Jury §§ 197, 201-203.**

Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.

11. Jury § 222 (NCI4th)— capital sentencing—death penalty views—excusal of prospective juror for cause

The trial court properly excused a prospective juror for cause in a capital sentencing proceeding where her responses to questions by the prosecutor and the court indicated that her feelings about the death penalty would prevent her from following the law and from being a fair and impartial juror. The trial court was not required to permit counsel for defendant to attempt to rehabilitate this juror, and there was no requirement that the trial court offer any further explanation of the law of capital sentencing before excusing her for cause.

Am Jur 2d, Jury § 290.

12. Criminal Law § 1363 (NCI4th)— capital sentencing—sentences for other related crimes—not mitigating circumstance

The trial court properly refused to allow the jury in a capital sentencing proceeding to consider as mitigation three consecutive sentences totaling 80 years imposed on defendant for crimes arising from the same transaction as the capital crime since (1) those sentences are not circumstances tending to justify a sentence less than death for the capital crime, and (2) a reference to additional sentences improperly injects the issue of parole into the capital sentencing proceeding because, in order for information of separate sentences to have any bearing on a jury's choice between life imprisonment and death, the jury must presuppose the possibility of defendant's parole for his potential life sentence. Furthermore, defendant was not entitled to introduce evidence of these sentences as rebuttal to the State's use of the attendant crimes as evidence of aggravating circumstances.

Am Jur 2d, Criminal Law §§ 598 et seq.

13. Criminal Law § 1309 (NCI4th)— capital sentencing—testimony about "gay" person and club—admissibility for corroboration— not plain error

The trial court did not err by failing to exclude in a capital sentencing hearing testimony that a certain bar was a "gay club" and that a man in a group of persons with defend-

STATE v. ROBINSON

[336 N.C. 78 (1994)]

ant was a "gay person" since this testimony effectively cor-
roborated a witness's testimony concerning defendant's activities
and location on the night prior to the crime, and the testimony
does not appear unduly inflammatory or designed to exploit
any prejudice against homosexuals. Assuming, *arguendo*, that
it was error to admit this testimony, defendant failed to object
to this testimony and its admission was not plain error.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

14. **Evidence and Witnesses § 2917 (NCI4th) — capital sentencing —
cross-examination to show bias — exclusion of testimony not
prejudicial**

Assuming that cross-examination of a witness in a capital
sentencing proceeding about whether, when he negotiated a
plea, he was told the sentence he could have received in this
case and whether he was advised that any breach of the law
would be a violation of his parole should have been permitted
to show bias of the witness, defendant was not prejudiced
by the exclusion of this testimony where it was made clear
that the State had no leverage over the witness to cause
him to testify against defendant in this sentencing hearing,
and the witness's answers to these questions could not have
shown any bias that was not clearly revealed through other
examination of the witness. N.C.G.S. § 8C-1, Rule 611(b).

**Am Jur 2d, Witnesses § 520.**

15. **Criminal Law § 1363 (NCI4th) — capital sentencing — ability
to adjust to prison — mitigating circumstance — refusal to
submit — harmless error**

Although it was error for the trial court to refuse to
submit in a capital sentencing proceeding the mitigating cir-
cumstance that "in a structured prison environment, [defend-
ant] is able to conform his behavior to the rules and regulations
and performs tasks he is required to perform," this error was
harmless beyond a reasonable doubt where defendant was al-
lowed to introduce evidence concerning his conduct in prison
and his ability to adjust to prison life; the court's submission
of two other mitigating circumstances dealing with defendant's
conduct in prison, as well as the catchall mitigating circumstance,
allowed the jury to fully consider this evidence; and the jury
answered "no" to each of these circumstances, indicating that

no juror found any of these circumstances to exist and have mitigating value. The holding in *State v. Pinch*, 306 N.C. 1, that the ability to adjust to prison is irrelevant to sentencing is overruled to the extent that it conflicts with the decision of *Skipper v. South Carolina*, 476 U.S. 1.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**16. Criminal Law § 1310 (NCI4th) — capital sentencing — mitigating evidence — questions disallowed — relevancy of answers not apparent — answer shown by other evidence**

Defendant is precluded from predicating error upon the trial court's sustaining of the State's objection in a capital sentencing proceeding to a question to defendant's sister about their father's treatment of defendant's sisters and a question to defendant's wife about her comprehension of the nature of a capital sentencing proceeding where defendant made no offer of proof at trial to preserve the answers of the witnesses, and the context within which the questions were asked gives no indication of any relevance the responses of the witnesses may have had to the mitigation of defendant's crime. Furthermore, the trial court did not err by sustaining the State's objection to a question to defendant's wife about her attitude toward defendant where her feelings about defendant were made clear by her later testimony.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**17. Criminal Law § 1323 (NCI4th) — capital sentencing — mitigating circumstances — instructions — finding of mitigating value**

The trial court did not err by instructing the jury in a capital sentencing proceeding that it should find whether each nonstatutory mitigating circumstance existed and then whether that circumstance had mitigating value.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**18. Criminal Law § 1355 (NCI4th) — capital sentencing — mitigating circumstance — no significant criminal history — submission not required**

The trial court in a capital sentencing proceeding did not err by refusing to submit the statutory mitigating circumstance that "defendant had no significant history of prior criminal activity" where there was evidence of defendant's continuous,

extensive, and recent involvement in criminal activity, including his use and sale of drugs and his conviction of the violent crime of robbery of a U-Haul Center and two of its employees. N.C.G.S. § 15A-2000(f)(1).

**Am Jur 2d, Criminal Law §§ 598 et seq.**

19. **Criminal Law § 1325 (NCI4th)— capital sentencing—mitigating circumstances considered—instructions comporting with McKoy decision**

The trial court did not err by instructing the jury in Issue Four of a capital sentencing proceeding that, in determining whether the aggravating circumstances, when considered with the mitigating circumstances, were sufficiently substantial to call for the imposition of the death penalty, "each juror may consider any mitigating circumstance that juror determined to exist by a preponderance of the evidence." Each juror was not required by *McKoy v. North Carolina*, 494 U.S. 433, to consider any mitigating circumstance found by *any* of the jurors when weighing the aggravating and mitigating circumstances.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

20. **Criminal Law § 1325 (NCI4th)— capital sentencing— consideration of mitigating circumstances—instructions comporting with McKoy decision**

The trial court's capital sentencing instructions which informed the jury at Issue Three and Issue Four that it *must* weigh any mitigating circumstances it found to exist against the aggravating circumstances and that each juror "may" consider any mitigating circumstance or circumstances that juror determined to exist by a preponderance of the evidence did not allow jurors to disregard properly found mitigating circumstances and fully comported with *McKoy v. North Carolina*, 494 U.S. 433.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

21. **Criminal Law § 1348 (NCI4th)— capital sentencing—definition of mitigating circumstance**

The trial court's instructions defining mitigating circumstance in a capital sentencing proceeding, which were virtually identical with the Pattern Jury Instructions, were a

correct statement of the law of mitigation and did not preclude the jury from considering any aspect of defendant's character which he may have presented as a basis for a sentence less than death.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

22. **Criminal Law § 1325 (NCI4th)— capital sentencing—consideration of mitigating circumstances—erroneous instruction—harmless error**

Any error in the trial court's instruction in Issue Three of a capital sentencing proceeding that each juror may consider any mitigating circumstance that the "jury," rather than "juror," determined to exist by a preponderance of the evidence in Issue Two did not preclude an individual juror from considering mitigating evidence that such juror alone found in Issue Two and was harmless where the jury was clearly instructed for each of the mitigating circumstances submitted in Issue Two that only one or more of the jurors was required to find that the mitigating circumstance existed and that it was deemed mitigating, and it was thus clear that, in order for the "jury" to find the existence of a mitigating circumstance, only one juror was required to find that circumstance.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

23. **Criminal Law § 860 (NCI4th)— capital sentencing—refusal to instruct on meaning of life imprisonment**

The trial court did not err by refusing to give defendant's requested instruction in a capital sentencing proceeding that "the term 'life imprisonment' means life imprisonment" since such an instruction would unnecessarily present the issue of parole without any indication that the jury was considering that possibility, and the requested instruction was an inaccurate statement of the law. Absent jury inquiry as to the meaning of a life sentence or an inquiry as to the eligibility of defendant for parole, the trial court should not instruct the jury as to how it is to consider the meaning of the term "life imprisonment."

**Am Jur 2d, Trial § 890.**

**Prejudicial effect of statement or instruction of court as to possibility of parole or pardon. 12 ALR3d 832.**

24. **Criminal Law § 931 (NCI4th) — capital case — impeachment of verdict — juror beliefs about parole — internal influences — affidavits inadmissible**

The trial court properly denied defendant's motion for appropriate relief in a capital case based on juror affidavits that the jury's recommendation of the death penalty was the result of erroneous beliefs about defendant's eligibility for parole in the event a life sentence was imposed since jurors' beliefs concerning parole eligibility relate to "internal" influences on a jury, N.C.G.S. § 8C-1, Rule 606(b) prohibits juror testimony that impeaches a jury verdict on the basis of internal influences, and the jurors' affidavits thus could not be considered by the trial court.

**Am Jur 2d, Trial §§ 1219 et seq.**

25. **Criminal Law § 951 (NCI4th) — denial of motion for appropriate relief — evidentiary hearing unnecessary**

The trial court did not err by denying defendant's motion for appropriate relief without an evidentiary hearing where the court correctly determined that juror affidavits supporting the motion were inadmissible and that defendant was not entitled to relief as a matter of law. N.C.G.S. § 15A-1420(c)(2).

**Am Jur 2d, Coram Nobis and Allied Statutory Remedies § 59.**

26. **Criminal Law § 455 (NCI4th) — jury argument — deterrent effect of death penalty — no gross impropriety**

Even if the prosecutor's argument to the jury in a capital sentencing proceeding could be construed as an argument about the general deterrent effect of the death penalty, it was not so grossly improper as to warrant *ex mero motu* intervention by the trial court.

**Am Jur 2d, Trial §§ 229, 497 et seq.**

27. **Criminal Law § 442 (NCI4th) — capital sentencing — jury argument — jury as voice of community**

The prosecutor did not tell the jurors in a capital sentencing proceeding to decide defendant's punishment based on community sentiment when he explained to the jurors that they were the voice and conscience of the community and reminded

STATE v. ROBINSON

[336 N.C. 78 (1994)]

the jurors that it was their responsibility to make a decision by stating: "It's your verdict. It's how you look at it."

**Am Jur 2d, Trial §§ 225 et seq.**

28. **Criminal Law § 452 (NCI4th)— capital sentencing—jury argument—comments about mitigating circumstances**

The prosecutor's closing argument in a capital sentencing proceeding that defendant's mitigating circumstances can be pretty much grouped into categories like "Society made me do it" or "My family made me do it" was not a misstatement of the law of mitigation or a statement of facts not in evidence but was a rebuttal of circumstances supported by defendant's evidence that he was abused by his father, that his parents were alcoholics, and that defendant was a member of an inner-city culture where illegal activities are the accepted standard. Furthermore, the prosecutor's characterization of defendant's evidence in mitigation as an "evasion of responsibility" was not an improper depreciation of mitigating evidence but was a proper comment directed toward the weight that the jury should give to defendant's evidence.

**Am Jur 2d, Trial §§ 497 et seq.**

29. **Criminal Law § 449 (NCI4th)— capital sentencing—jury argument—race not cause or excuse**

The prosecutor's closing argument in a capital sentencing proceeding to the effect that defendant's race was not the cause of his criminal behavior and should not serve as an excuse was not an improper racial comment but was only a response to testimony by defendant's expert that defendant's inner-city upbringing was, in part, a cause of his criminal behavior and did not require intervention on the part of the trial court.

**Am Jur 2d, Trial §§ 283 et seq.**

**Prosecutor's appeal in criminal case to racial, national, or religious prejudice as ground for mistrial, new trial, reversal, or vacation of sentence—modern cases. 70 ALR4th 664.**

30. **Criminal Law § 436 (NCI4th)— capital sentencing—jury argument—drug use after murder—comment on lack of remorse**

The prosecutor's closing argument in a capital sentencing proceeding that scarcely two hours after the murder, defend-

ant was "coming out of a room with a needle in his arm, dancing to the music" was a proper comment on defendant's lack of remorse, not an improper offer of defendant's drug use as an aggravating circumstance.

**Am Jur 2d, Trial §§ 497 et seq.**

31. **Jury § 261 (NCI4th) — peremptory challenges — reservations about death penalty**

The trial court did not err in allowing the prosecutor in a capital sentencing proceeding to exercise peremptory challenges against those jurors who expressed reservations about imposing the death penalty.

**Am Jur 2d, Jury §§ 233 et seq.**

32. **Criminal Law § 1327 (NCI4th) — capital sentencing — duty to recommend death — pattern instruction constitutional**

The pattern jury instruction that imposes a duty upon the jury to return a recommendation of death if it finds that the mitigating circumstances are insufficient to outweigh the aggravating circumstances is not unconstitutional.

**Am Jur 2d, Trial §§ 888 et seq.**

33. **Jury § 103 (NCI4th) — capital sentencing — denial of individual voir dire and sequestration of jurors**

The trial court did not err when it denied defendant's motion for individual *voir dire* and sequestration of jurors in a capital sentencing proceeding.

**Am Jur 2d, Jury § 197.**

34. **Criminal Law § 1373 (NCI4th) — death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not imposed under the influence of passion, prejudice, or any other arbitrary factor and is not disproportionate to the penalty imposed in similar cases considering the crime and the defendant where (1) the jury found as aggravating circumstances that defendant had previously been convicted of a felony involving the use of violence to the person, that the murder was committed while defendant was engaged in the commission of robbery, and that the murder was part of a course of conduct in which defendant engaged

**STATE v. ROBINSON**

[336 N.C. 78 (1994)]

and which included the use of violence against other persons; (2) the evidence tended to show that defendant came to this state to sell drugs and to commit some crime; he purposefully abstained from the use of drugs in preparation for his crime; he roamed about the High Point area looking for a suitable target and decided to rob a Western Steer restaurant; defendant forced the manager and two employees at gunpoint to go from the parking lot back into the restaurant; when the manager was unable to open the safe, defendant shot him in the leg; after the safe was finally opened, defendant threw the manager out of the way and took out two money bags; he then forced all three victims to the back of the restaurant, personally dragging the manager down the hall; defendant forced the victims to lie on the floor; and defendant rejected his companion's suggestion that they lock the victims up in the meat cooler and personally shot each of the victims in the head, killing the manager and seriously wounding the two employees; (3) defendant showed no remorse for his actions, never sought medical attention for his victims, and a short time after the murder gleefully danced to music while injecting cocaine purchased with the stolen money; (4) defendant never acknowledged his part in the murder or cooperated with the police in the investigation and had to be forced out of his Maryland home by the use of a S.W.A.T. team and a trained dog; (5) there was no evidence of any provocation or threat to defendant on the part of the victims; and (6) it is manifestly clear that defendant intended the death of all three victims and not just that of the manager.

**Am Jur 2d, Criminal Law § 628.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Ross, J., at the 18 May 1992 Special Criminal Session of Superior Court, Guilford County. Heard in the Supreme Court 8 December 1993.

*Michael F. Easley, Attorney General, by Ellen B. Scouten, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, and Gretchen Engel, North Carolina Resource Center, for defendant-appellant.*

STATE v. ROBINSON

[336 N.C. 78 (1994)]

MEYER, Justice.

On 17 March 1986, defendant, Dwight Lamont Robinson, was indicted by a Guilford County grand jury for the first-degree murder of Robert Page and for robbery with a dangerous weapon. On 6 April 1987, defendant was also indicted for two counts of assault with a deadly weapon with intent to kill inflicting serious injury upon Gene Hill and Tammy Cotner. The offenses were joined for trial. On 17 September 1987, the jury returned verdicts of guilty of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. The jury also found defendant guilty of robbery with a dangerous weapon, and guilty on both counts of assault with a deadly weapon with intent to kill inflicting serious injury. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended and the trial court, on 22 September 1987, imposed the sentence of death in the first-degree murder case. Defendant was also sentenced to forty years for the robbery with a dangerous weapon conviction and twenty years each for the two convictions of assault with a deadly weapon with intent to kill inflicting serious injury.

On defendant's direct appeal, this Court affirmed the convictions for first-degree murder, robbery with a dangerous weapon, and two counts of assault with a deadly weapon with intent to kill inflicting serious injury, but vacated the death sentence because of *McKoy* error, and the case was remanded for a new capital sentencing proceeding. *State v. Robinson*, 330 N.C. 1, 409 S.E.2d 288 (1991). At the new sentencing proceeding, conducted at the 18 May 1992 Special Criminal Session of Superior Court, Guilford County, the jurors returned a recommendation of death. Judge Thomas W. Ross, in accordance with the jury's recommendation, imposed a sentence of death.

Defendant has brought forth fifty-four assignments of error. After a careful and thorough review of the transcript, the record, the briefs, and oral arguments of counsel, we conclude that defendant received a fair resentencing hearing, free of prejudicial error.

Except where necessary to develop and determine the issues presented to this Court arising from defendant's resentencing hearing, we will not repeat the evidence supporting defendant's convictions, as that evidence is summarized in our prior opinion on defendant's direct appeal.

**STATE v. ROBINSON**

[336 N.C. 78 (1994)]

JURY SELECTION ISSUES

Defendant contends that his constitutional right to a jury selected without regard to race was violated by the prosecutor's discriminatory use of peremptory strikes against potential jurors of African-American descent. In *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986), the Supreme Court of the United States set forth a three-step process to determine if a prosecutor has impermissibly excluded jurors because of their race. First, a criminal defendant must make out a *prima facie* case of racial discrimination by the prosecutor in the exercise of peremptory challenges. *Robinson*, 330 N.C. at 15, 409 S.E.2d at 296.

In this case, the prosecutor voluntarily gave reasons for the dismissal of each of the jurors in question. Accordingly, we need not address the question of whether defendant has made a *prima facie* showing of discrimination and may proceed as if defendant has met this burden. *See id.* at 17, 409 S.E.2d at 296.

· The second step in a determination of whether the State has used its peremptory challenges in a discriminatory manner requires the State to "articulate legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group." *State v. Jackson*, 322 N.C. 251, 254, 368 S.E.2d 838, 840 (1988), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989). It is then the trial court's responsibility to "determine whether the defendant has carried his burden of proving purposeful discrimination." *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991).

[1] Although the reasons offered by the State in support of its decision to exercise a peremptory challenge "need not rise to the level justifying exercise of a challenge for cause," *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, they must demonstrate that the prosecutor was not excluding jurors "on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant," *id.* at 89, 90 L. Ed. 2d at 83.

[2] Factors to which this Court has looked in the past to help determine the existence or absence of purposeful discrimination include (1) " 'the susceptibility of the particular case to racial discrimination,' " *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d

144, 150 (1990) (quoting *State v. Antwine*, 743 S.W.2d 51, 65 (Mo. 1987), *cert. denied*, 486 U.S. 1017, 100 L. Ed. 2d 217 (1988) ); (2) whether similarly situated whites were accepted as jurors, *Robinson*, 330 N.C. at 19, 409 S.E.2d at 298; (3) whether the State used all of its peremptory challenges, *Jackson*, 322 N.C. at 255, 368 S.E.2d at 840; (4) the race of the witnesses in the case, *id.*; (5) whether the early pattern of strikes indicated a discriminatory intent, *State v. Smith*, 328 N.C. 99, 124, 400 S.E.2d 712, 724 (1991); *see also State v. Jackson*, 322 N.C. at 255, 368 S.E.2d at 840; and (6) the ultimate racial makeup of the jury, *Smith*, 328 N.C. at 124, 400 S.E.2d at 712. In addition, "[a]n examination of the actual explanations given by the district attorney for challenging black veniremen is a crucial part of testing defendant's *Batson* claim." *Id.* at 125, 400 S.E.2d at 726. It is satisfactory if these explanations have as their basis a "legitimate hunch" or "past experience" in the selection of juries. *State v. Thomas*, 329 N.C. 423, 407 S.E.2d 141 (1991); *see also Porter*, 326 N.C. 489, 391 S.E.2d 14.

[3]   When evaluating the prosecutor's stated reasons for dismissal, the ultimate question to be decided by the trial court is whether the prosecutor was exercising his peremptory challenges with a discriminatory intent. The United States Supreme Court has acknowledged that, "[a]s with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' " *Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 409 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 83 L. Ed. 2d 841, 854 (1985) ). The findings of a trial court are not to be overturned unless the appellate court is "convinced that its determination was clearly erroneous." *Id.* at 368, 114 L. Ed. 2d at 412. " 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " *Thomas*, 329 N.C. at 433, 407 S.E.2d at 148 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 84 L. Ed. 2d 518, 528 (1985) ).

In this sentencing hearing, defendant was black and his three victims were white. One of the key witnesses, Thomas Wood, was black. At the time of the sentencing hearing, defendant was thirty-one years old.

[4]   Defendant raised his first *Batson* challenge when the prosecutor struck jurors Lolita Page and Evelyn Lee. At this point, the State had examined twelve jurors, eight of whom were white and four

black. The prosecutor accepted two of the black jurors and challenged two. As the basis for his exercise of the peremptory challenge, the prosecutor stated (1) that Ms. Page was a liberal arts teacher, she had a master's degree in education, and her husband was also a teacher and had been for twenty years; (2) that she had a male child sixteen years old and that she would have sympathy for defendant and not for the State; and (3) that she answered some of the questions with her arms folded and did not answer in a very direct manner. The prosecutor stated that he did not feel that she would be a juror who would be fair and impartial toward the State.

[5] With regard to Evelyn Lee, the prosecutor noted that she had stated that she was eager to attend her granddaughter's graduation from Towson State University on Thursday, that she had a doctor's appointment the following Monday, and that she had back problems that she mentioned in response to the prosecutor's question whether anyone on the jury had any problems that would interfere with his or her service as a juror. She had a male child twenty-eight years of age and another forty-one years of age. When asked if she had ever been a witness in a civil case, she confused being a witness with being a juror. In addition, she listed her age as fifty-nine but appeared to the prosecutor to be much older than that. The prosecutor concluded by stating that, given her age, her family obligations, the male children in her family, and her somewhat confused state in answering the questions, she would not be a completely fair and impartial juror in the case.

Before overruling defendant's *Batson* objection, the trial court noted that there was no *prima facie* showing of discrimination, that two of the ten jurors passed to the defendant were black, and that four of the ten passed to the State were black. Defendant made no further showing at trial regarding jurors Page and Lee. We hold that the trial court did not err in overruling defendant's objection to the State's use of its peremptory challenges for jurors Page and Lee.

[6] In his second *Batson* objection, defendant questioned the State's dismissal of juror Lyles. Prior to defendant's objection to the excusal of juror Lyles, the State had also exercised a peremptory challenge, without objection, to excuse juror Arrington. In overruling defendant's objection to the State's excusal of juror Lyles, the trial court stated:

**STATE v. ROBINSON**

[336 N.C. 78 (1994)]

That the Court has observed the questioning by counsel for the State of all the jurors. That the Court can distinguish no significant variance between the method of inquiry followed by the State for any juror. That there is no evidence that the jurors were asked different questions, depending on whether they were black or white.

That there are now three blacks seated on the jury. That even though the passing and seating of a black on a jury does not, in and of itself, obviate a claim for discrimination, that it is evidence of a lack of purposeful discrimination by the State.

That no questions have been asked by the District Attorney that are racial in nature, or oriented only to persons of one race.

And further, the Court would find that eleven black jurors in total have been called to the jury box. Four, including Ms. Lyles, if the Court allows, would be excused by peremptoral [sic] challenges exercised by the State, to which three have been objected by the defendant.

That three are seated on the jury, and that the remainder have been excused, without objection, by the Court for cause.

Based on these findings, the Court would conclude that the State has not engaged in any purposeful discrimination in the selection of jurors or the exercise of peremptoral [sic] challenges.

After the State was allowed to exercise its peremptory challenge of Ms. Lyles, the State volunteered the following reasons for its challenge: that Ms. Lyles had only lived at the same address for three months, that she had trouble remembering her other address, and that she was hesitant to do so. She also could not remember the name of the trucking company for which her husband had worked for three years. She had a male child seventeen years old, and the prosecutor believed that members of her family had been in trouble in the City of High Point. The State contended that her lack of attention to detail would make her unable to retain the evidence that was to come forward and that her family relations and the age of her son would cause her to sympathize with the defendant. We hold that the trial court properly denied defendant's objection to the State's use of this peremptory challenge.

## STATE v. ROBINSON

[336 N.C. 78 (1994)]

[7] Defendant's third *Batson* challenge came at the State's excusal of juror McCrimmon. As reasons for Ms. McCrimmon's dismissal, the State contended that she had a pending court appearance for driving while impaired (DWI) and that it would be the district attorney's office that would prosecute her. The State further argued that she had stated that she would hold the State to a higher burden of proof in a death penalty case. When asked if she had any strong leanings one way or the other, she stated that she leaned toward life and that she did not think that she could impose the death penalty.

Counsel for defendant argued that another white juror had reported that he had been charged with DWI but had been passed by the State. The prosecutor informed the judge that it was his information that the white juror's DWI case was closed and no longer pending. The trial court noted for the record that Ms. McCrimmon indicated that her case was pending and that a court appearance had been scheduled during the time that it was anticipated the sentencing hearing would continue.

The trial court summarized the entire jury selection proceeding as it had thus far taken place and concluded as follows:

> That at this point in the jury selection, based upon the way that the jury selection has proceeded, based upon the State having passed previously black jurors which have been seated on the jury, based upon the lack of any discernible difference in the method of questioning, or any racially motivated questions or questions of a racial nature, that the Court would find and conclude that the defendant has failed to make a prima facie showing of purposeful discrimination in the jury selection process by the State.

The trial court further found that the reasons stated for Ms. McCrimmon's removal were "clear and reasonable for the exercise of a peremptoral [sic] challenge, and are related to this case." We hold that the trial court properly overruled defendant's objection to the State's excusal of juror McCrimmon.

[8] Defendant's next *Batson* challenge occurred when the State excused juror Bivens. The State's excusal of Ms. Bivens came shortly after this exchange during *voir dire*:

STATE v. ROBINSON

[336 N.C. 78 (1994)]

MR. KIMEL: Would you lean more toward life imprisonment in this particular case, just from the nature of the punishment?

MS. BIVENS: Yes.

MR. KIMEL: Do you think that your feelings or leanings in this case would substantially impair your ability to sit as a juror? In other words, make it difficult for you to sit as a juror?

MS. BIVENS: Somewhat.

After defendant objected to the State's peremptory challenge, the State offered its reasons for excusing juror Bivens, saying that Ms. Bivens equivocated on her position on capital punishment and that her leanings were toward life imprisonment. The prosecutor further noted that Ms. Bivens was separated from her husband and had a male child near the age of defendant. The prosecutor felt that defendant would probably present evidence of a broken home full of abuse and that "based on [the prosecutor's] eleven years of picking juries, in [the prosecutor's] opinion this woman would have never voted for capital punishment in this particular case or in any particular case."

The trial court adopted the findings of fact made in its ruling on the excusal of juror McCrimmon and held that defendant had failed to make a *prima facie* case of purposeful discrimination with regard to the State's excusal of juror Bivens. The trial court further ruled "that the State has indicated clear and reasonable reasons for the exercise of its peremptoral [sic] challenge relating to this case, and also has established racially neutral reasons for the challenge to the juror." We hold that the trial court did not err in overruling defendant's objection to the State's excusal of juror Bivens.

[9] Defendant's next *Batson* challenge came when the State excused juror Brooks. As reasons for Mr. Brooks' dismissal, the State first noted that in response to the jury questionnaire inquiry, "Are you presently employed, unemployed, or retired," Mr. Brooks answered "yes." The prosecutor contended that this response indicated a lack of ability to comprehend or a lack of attention to detail that would not make him a good juror.

In addition, the State pointed out that Mr. Brooks had a pending DWI charge with a court date within two weeks. Mr. Brooks

## STATE v. ROBINSON

[336 N.C. 78 (1994)]

had also been convicted for nonsupport of illegitimate children and had been back to court three times since that conviction for failure to comply with court orders. The prosecutor pointed out that it was his office that had been presenting evidence against Mr. Brooks for the past five years. Finally, the prosecutor noted that Mr. Brooks was thirty-one years old, almost the same age as the defendant.

The trial court adopted the findings made in its holding regarding the excusal of juror McCrimmon and made further findings detailing the jury selection proceedings since McCrimmon's excusal. The trial court then found that defendant had not made a *prima facie* case of purposeful discrimination and held that Mr. Brooks' pending DWI charge was race-neutral, reasonable, and clearly related to the trial. The trial court also held that this reason alone would have been enough to justify the State's use of its peremptory challenge, but took further notice of the other reasons offered by the State.

We hold that the trial court properly overruled defendant's objection to the State's use of its peremptory challenges to excuse each of these jurors. Taken singly or in combination, the State's excusal of these jurors was based on race-neutral reasons that were clearly supported by the individual jurors' responses during *voir dire*. The trial court correctly ruled that the State did not exclude any jurors based solely upon their race in violation of *Batson v. Kentucky*. Defendant's assignments of error on these grounds are overruled.

[10] In defendant's next assignment of error, he contends that the trial court erred when it precluded him from inquiring if prospective jurors could consider a life sentence if, in the event he was found guilty of premeditated murder, they found that mitigating circumstances outweighed aggravating circumstances.

As support for this proposition, defendant relies upon *Morgan v. Illinois*, --- U.S. ---, 119 L. Ed. 2d 492 (1992), in which it was held that a defendant is "entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case-in-chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." *Id.* at ---, 119 L. Ed. 2d at 507. In the present case, defendant contends that because the trial judge sustained objections to certain of his questions to jurors,

he was denied his right to engage in the line of inquiry permitted by *Morgan*.

The first instance of which defendant complains occurred on the first day of jury selection when his counsel attempted to ask the following question:

> MR. ALEXANDER: And I ask this to the other jurors I've already talked to. Under the factual situation that I have explained to you, would you have any trouble giving—if the evidence and mitigating circumstances so warranted, and other evidence—the defendant life imprisonment. Or, under those facts or situations, would you be prone to give the defendant the death penalty?
>
> MR. KIMEL: We object to that question as it's phrased.
>
> THE COURT: Sustained.

Counsel for defendant made no attempt at that time to rephrase the question.

In his other assignment of error on these grounds, the State's objection was sustained *as to form* regarding a question that was asked at the end of three transcript pages of uninterrupted dialogue by defendant's counsel:

> Under the facts that I have stated, if you found that the mitigating circumstances were sufficient to outweigh the aggravating circumstances, could you vote for life imprisonment?
>
> MR. KIMEL: Objection to the form of the question.
>
> THE COURT: Well, sustained to the form.

Again, counsel for defendant made no attempt at this time to rephrase the question.

In *Morgan v. Illinois*, the United States Supreme Court held that a defendant must be allowed, through the use of jury *voir dire*, an opportunity "to lay bare the foundation of [his] challenge for cause against those prospective jurors who would *always* impose death following conviction." *Morgan*, --- U.S. at ---, 119 L. Ed. 2d at 506. In *Morgan*, the defendant's question was whether the juror would "automatically vote to impose the death penalty no matter what the facts are." *Id.* at ---, 119 L. Ed. 2d at 499. The questions in this case bear little resemblance to that specifical-

STATE v. ROBINSON

[336 N.C. 78 (1994)]

ly authorized in *Morgan.* Furthermore, the State's objection was sustained only as to the form of the question, leaving defense counsel free to ask the question again in proper form.

The trial court properly sustained *as to form* the objections to these questions. The first question was simply not properly phrased; it was too broad and could properly have been viewed by the trial court as impermissible attempts to indoctrinate the prospective juror. *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980) ("Counsel should not engage in efforts to indoctrinate"). The second question was predicated upon a three-page, uninterrupted, rambling recitation of hypothetical facts. The hypothetical nature and phrasing of the questions tend to cause jurors to pledge themselves to a decision in advance of the evidence to be presented and are therefore improper. *State v. Bracey*, 303 N.C. 112, 277 S.E.2d 390 (1981); *State v. Vinson*, 287 N.C. 326, 215 S.E.2d 60 (1975), *death sentence vacated*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976). In addition, the questions were properly objectionable as ambiguous compound questions that created a likelihood of confusing the jury.

Assuming, *arguendo*, that the trial court was required, under *Morgan*, to allow these particular questions, any error in excluding them was rendered harmless by the fact that defendant was allowed to satisfy his inquiry through further use of *voir dire* by himself and by the trial court.

Each time a group of new jurors was impaneled, the trial court gave the entire group certain instructions and asked certain preliminary questions. One example of the trial court's *voir dire* is the following exchange:

Do any of you all have personal feelings about capital punishment, that is, about the death penalty, either for or against it, which you feel would prevent you from, or substantially impair your ability to perform the duty of a juror to fairly consider both possible punishments, life imprisonment and death? Anybody have any such personal feelings, that you think would interfere with your ability or impair your ability to fairly consider both possible punishments?

(All twelve prospective jurors gave a negative response.)

THE COURT: I take it, then, by your silence or the nodding of your heads—well, let me ask you, do all of you feel

> that you can fairly consider both possible punishments, life
> imprisonment and death, and make a recommendation of one
> or the other of those, based on the evidence and the law?

(All twelve prospective jurors gave an affirmative response.)

Nearly identical instructions were given each time additional jurors
were impaneled. After concluding its instructions and *voir dire*,
the trial court passed the jury to the State and ultimately defendant
for further *voir dire*.

After the trial court properly sustained the State's objection
to defendant's first question at issue, defendant continued, even-
tually asking the same group of jurors the following question:

> I direct these questions to all members of the jury. Under
> the facts I have stated, if you found that the mitigating cir-
> cumstances were sufficient to outweigh the aggravating cir-
> cumstances, could you render a verdict of life imprisonment
> in this trial?

(All twelve jurors gave an affirmative response.)

We thus hold that any error arising from the State's objection
to the question previously put to this group of jurors was harmless
beyond a reasonable doubt because defendant was allowed to satisfy
his right to inquiry through further use of *voir dire*. The State's
objection to the second question at issue came on the fourth day
of jury selection. The record indicates that during the interim,
the trial court consistently allowed counsel for defendant great
latitude to inquire about jurors' feelings toward the death penalty,
both as a group and individually. With regard to the group to
which counsel for defendant directed the second question at issue,
it had been questioned by the trial court as before, specifically,
whether the jurors could consider both possible punishments. Ac-
cordingly, any error arising from the State's objection to the second
question is likewise harmless beyond a reasonable doubt.

*Morgan* stands for the principle that a defendant in a capital
trial must be allowed to make inquiry as to whether a particular
juror would automatically vote for the death penalty. "Within this
broad principle, however, the trial court has broad discretion to
see that a competent, fair, and impartial jury is impaneled; its
rulings in this regard will not be reversed absent a showing of
abuse of discretion." *State v. Yelverton*, 334 N.C. 532, 541, 434

STATE v. ROBINSON

[336 N.C. 78 (1994)]

S.E.2d 183, 188 (1993). We hold that defendant was afforded a fair opportunity to make the inquiries specifically authorized in *Morgan*, and his assignment of error on these grounds is overruled.

[11] In his next assignment of error, defendant contends that the trial court erred when it excused juror Stacy Martin for cause. After doing so, and after excusing the remainder of the jury from the courtroom, the trial court noted the following for the record:

> The prospective juror Ms. Martin was excused by the Court for cause, having indicated, the Court would find unequivocally, opposition to capital punishment which would interfere with her ability to follow the law, and would substantially impair her in her ability to fairly consider both possible punishments.

The law with regard to whether a trial court may excuse a juror for cause based on his feelings concerning the death penalty is clear. The test is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)).

After indicating that her religious beliefs would cause her to have a "hard time deciding for capital punishment," Ms. Martin responded to the following questions:

> MR. KIMEL: Do you think that those strong moral or religious feelings or objections you have to capital punishment, do you feel like those would substantially impair your ability to sit as a juror in this case, and fairly consider both capital punishment and life imprisonment?

> MS. MARTIN: I think, when it came down to the end, it would.

> MR. KIMEL: So you are saying that you think your feelings, those moral feelings that you have, they would substantially impair your ability as a juror to follow the law that the Judge gives you?[ ]

> MS. MARTIN: Yes.

> . . . .

**STATE v. ROBINSON**

[336 N.C. 78 (1994)]

MR. KIMEL: All right. So what you're saying is, you feel like those religious beliefs would substantially impair your ability to be a fair and impartial juror in this case?

MS. MARTIN: Yes, sir.

After counsel for defendant objected to the State's challenge for cause, the trial court determined that Ms. Martin understood various aspects of the capital sentencing scheme and asked the following questions:

THE COURT: Do you feel that your personal feelings about capital punishment would substantially impair your ability to fairly consider both possible punishments, life imprisonment and death?

MS. MARTIN: I think so, your Honor.

THE COURT: Okay. Do you feel that you would be unable to put those personal feelings out of your mind, and make a determination on the law and the evidence?

MS. MARTIN: (Pause) I don't believe so.

THE COURT: You don't believe that you would?

MS. MARTIN: No.

Juror Martin's responses unequivocally indicate that her feelings about the death penalty would prevent her from following the law and from being a fair and impartial juror. The trial court properly excused Ms. Martin.

Defendant contends that the trial court should have explained the law to Ms. Martin or that counsel for defendant should have been allowed to rehabilitate juror Martin with further questioning about her feelings on the death penalty. However, "where the record shows the challenge is supported by the prospective juror's answers to the prosecutor's and court's questions, absent a showing that further questioning would have elicited different answers, the court does not err by refusing to permit the defendant to propound questions about the same matter." *State v. Gibbs*, 335 N.C. 1, 35, 436 S.E.2d 321, 340 (1993). Nor is there any requirement that the trial court offer any further explanation of the law of capital sentencing. Defendant's assignment of error on these grounds is overruled.

STATE v. ROBINSON

[336 N.C. 78 (1994)]

SENTENCING PROCEEDING ISSUES

[12]  In his next assignment of error, defendant contends that the trial court erred when it refused to allow the jury to consider as mitigation consecutive forty-, twenty-, and twenty-year sentences imposed on defendant for crimes arising from the same transaction as the murder.

At trial, defendant requested that the following instruction be given to the jury:

[T]he defendant has already received an 80-year sentence in this case for the following convictions: (1) robbery with a dangerous weapon whereby he received a 40-year sentence and (2) two counts of assault with a deadly weapon with intent to kill resulting in serious bodily injury in which the defendant received 20 years on each count.

As support for the submission of this instruction, defendant relies on the rule established in *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978). In that case, it was held that "the sentencer [must] . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 57 L. Ed. 2d at 990.

In *State v. Price*, 331 N.C. 620, 418 S.E.2d 169 (1992), *sentence vacated*, --- U.S. ---, 122 L. Ed. 2d 113, *on remand*, 334 N.C. 615, 433 S.E.2d 746 (1993), *petition for cert. filed* (No. 93-7348, 29 December 1993), we held "[t]hat defendant is currently serving a life sentence for another unrelated crime is not a circumstance which tends to justify a sentence less than death for the capital crime for which defendant is being sentenced." *Id.* at 634, 418 S.E.2d at 177. We think the same is true in the present case when defendant has been subjected to separate sentences for the offenses committed pursuant to the same crime.

Reference to additional sentences when a jury is considering a life sentence or a sentence of death necessarily injects the issue of parole into the proceedings. For information of separate sentences to have any bearing on a jury's choice between life imprisonment and death, the jury must presuppose the possibility of defendant's parole for his potential life sentence. As this Court held in *State v. Robbins*, "a criminal defendant's status under the parole laws

is irrelevant to a sentencing determination and, as such, cannot be considered by the jury during sentencing, whether in a capital sentencing procedure under N.C.G.S. § 15A-2000 or in an ordinary case." Robbins, 319 N.C. 465, 518, 356 S.E.2d 279, 310, cert. denied, 484 U.S. 918, 98 L. Ed. 2d 226 (1987); see also State v. Conner, 241 N.C. 468, 85 S.E.2d 584 (1955). Nor are we persuaded that defendant should have been allowed to introduce evidence of these sentences as rebuttal to the State's use of the attendant crimes as evidence of aggravating circumstances. Defendant's assignment of error on this issue is without merit.

[13] In his next assignment of error, defendant contends that the trial court erred in failing to exclude testimony that defendant contends was prejudicially tainted by homosexual innuendo.

The prosecutor examined a police officer who gave testimony concerning defendant's whereabouts on the evening of the crimes. After testifying that he had stopped defendant's car in Winston-Salem, the following exchange occurred:

Q. Are you familiar with the bar there in Winston-Salem, back in 1986, named Pookie's Bar?

A. Yes, sir.

Q. What kind of a bar was that back then, sir?

A. It was a bar where a lot of homosexuals went to.

Q. How far from Pookie's Bar was the defendant's car when you stopped it?

A. Approximately 11 blocks.

Later, the prosecutor asked this witness about the other passengers in the car:

Q. Were there any other people in that motor vehicle besides Mr. Robinson?

A. Yes, sir, there was.

Q. Would you describe the passenger in that motor vehicle to the members of the jury, please.

A. Yes, sir. He was a tall, slim, black male with feminine attributes.

Q. With what?

STATE v. ROBINSON

[336 N.C. 78 (1994)]

A. Feminine attributes.

Q. With feminine attributes?

A. Yes.

Later, during the presentation of the State's evidence, another witness testified that a man who was with defendant in an automobile was "a gay person."

Defendant contends that this testimony had no probative value and that the admission of the testimony was unfairly prejudicial. We disagree.

The State's principal witness, Thomas Wood, testified that the day prior to the crime, he, defendant, and a group of persons had gone from Wood's cousin's house to a "gay club" called Pookie's Lounge. During this testimony, Wood identified one of the members of the group as Frank Boozer, a gay man. Defendant did not object to the description of Frank Boozer as a gay man or to the characterization of Pookie's Lounge as a "gay club." Wood further testified that during the evening, defendant and Boozer disappeared for a period of two to three hours.

The testimony complained of by defendant on appeal effectively corroborates Wood's testimony concerning defendant's activities and location on the night prior to the crime. In addition, the testimony does not appear to be unduly inflammatory or designed to exploit any prejudice against homosexuals. We do not find it necessary, however, to engage in a detailed analysis of whether it was error to admit this testimony. Assuming *arguendo*, however, that it was error to admit this testimony, we note that defendant did not object to this testimony at trial. Accordingly, our review on appeal is limited to the question of whether the admission of the testimony constituted plain error. N.C. R. App. P. 10(c)(4). Plain error is "*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). Defendant has made no showing that these relatively innocuous remarks about other persons or places resulted in anything approaching this sort of injustice. Accordingly, defendant's assignment of error on these grounds is overruled.

[14] In his next assignment of error, defendant contends that the trial court erred when it sustained the State's objections to

certain questions asked by counsel for defendant during the cross-examination of Thomas Wood.

Defendant specifically assigns error to the following exchanges:

Q. Your attorney negotiated a plea, did he not?

A. Yes, he did.

Q. You weren't tried for this case, were you?

A. No, I wasn't.

Q. Sir?

A. No, I wasn't.

Q. Were you told the sentence that you could get in this case?

MR. COLE: Objection. He has to be told, Judge. By law, he has to be told.

THE COURT: Well, sustained.

Counsel for defendant attempted to ask this question twice more, but each time the State's objection, on the same grounds, was sustained. Later during Mr. Wood's testimony, the following occurred:

Q. Did you not know, when you got out of prison after the two years you were in prison for these crimes you are testifying here to today, didn't you realize that if you broke the law again, it would be a violation of your probation?

MR. KIMEL: Object to that, your Honor.

THE COURT: Sustained.

Q. Had you been advised that if you broke the law again, it could be a violation of your probation, by your probation officer?

MR. KIMEL: Objection.

THE COURT: Sustained.

Defendant contends that the testimony he sought was admissible for impeachment purposes under North Carolina Rule of Evidence 611(b). In addition, defendant contends that the trial court's failure to allow the testimony violated defendant's constitutional right to confront the witnesses against him.

STATE v. ROBINSON

[336 N.C. 78 (1994)]

Rule 611(b) states that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C.G.S. § 8C-1, Rule 611(b) (1992). Defendant contends that the answers to the questions he was prohibited from asking would have showed that Wood was biased or unreliable.

Assuming it was error for the trial judge to exclude these particular bits of testimony, we cannot see how defendant has been prejudiced. The transcript reveals that defendant was given the opportunity to fully explore the nature and extent of any bias on the part of Thomas Wood. It was made clear on both direct and cross-examination that Thomas Wood had testified for the State at defendant's original trial as well as the present sentencing hearing. After Wood testified at defendant's original trial, he pled guilty to various charges arising from' the crime at issue and was sent to prison. He was released from prison on parole but violated the conditions of his parole and was sent back to complete his original sentence as well as a sentence for unrelated convictions of forgery. Wood was in prison at the time of the second sentencing hearing but had volunteered to testify without being promised any sort of "deal" by the State. All of this was made clear through Wood's testimony.

Simply put, it was made clear that the State had no leverage over Wood to cause him to testify against defendant in this sentencing hearing. We fail to see how his answer to either of these questions could have showed any bias on Wood's part that was not clearly revealed through other examination of this witness. In addition, defendant did not attempt to preserve Wood's answers to these questions after objection by the State. Defendant is not entitled to a new sentencing hearing on these grounds.

[15] In his next assignment of error, defendant contends that the trial court erred when it refused to submit the mitigating circumstance that "[i]n a structured prison environment, Dwight Lamont Robinson is able to conform his behavior to the rules and regulations and performs tasks he is required to perform." The trial court, relying on *State v. Pinch*, 306 N.C. 1, 36, 292 S.E.2d 203, 229, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1056, 74 L. Ed. 2d 1031 (1983), *overruled in part on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988), denied defendant's request.

In *State v. Pinch*, this Court held that "an opinion from a psychiatrist about whether defendant 'would be able to adjust to life in prison' . . . would have concerned a matter totally irrelevant to sentencing." *Pinch*, 306 N.C. at 21, 292 S.E.2d at 220. Subsequent to our decision in *Pinch*, however, the United States Supreme Court has held that "evidence of adjustability to life in prison unquestionably goes to a feature of the defendant's character that is highly relevant to a jury's sentencing determination." *Skipper v. South Carolina*, 476 U.S. 1, 7 n.2, 90 L. Ed. 2d 1, 8 n.2 (1986). Accordingly, to the extent that our holding in *State v. Pinch* conflicts with *Skipper v. South Carolina*, that case is overruled. We now hold that it was error for the trial court not to submit the mitigating circumstance requested by defendant at trial.

The failure of the trial court to submit a mitigating circumstance that is supported by the evidence does not automatically necessitate a new sentencing hearing. *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied*, --- U.S. ---, 122 L. Ed. 2d 684, *reh'g denied*, --- U.S. ---, 123 L. Ed. 2d 503 (1993). In order to determine whether defendant is entitled to a new sentencing hearing, we find it helpful to engage in a brief examination of the context in which mitigating circumstances have presented themselves in the past.

In *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, the United States Supreme Court struck down an Ohio death penalty statute, stating:

> The limited range of mitigating circumstances which may be considered by the sentencer under the Ohio statute is incompatible with the Eighth and Fourteenth Amendments. To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors.

*Id.* at 608, 57 L. Ed. 2d at 992. The Court in that case reasoned that the sentencer in a capital case must "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 57 L. Ed. 2d at 990.

This Court has had several occasions to apply the rules established in *Lockett* and its progeny. One such occasion was *State v. Fullwood*, 323 N.C. 371, 373 S.E.2d 518 (1988), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 602, *on remand*, 329 N.C. 233, 404

STATE v. ROBINSON

[336 N.C. 78 (1994)]

S.E.2d 842 (1991). In that case, the defendant contended that the trial court erred when it refused to submit the mitigating circumstance that "the relationship between [the defendant] and the victim was extenuating." *Id.* at 391-92, 373 S.E.2d at 530. The trial court denied defendant's request to submit this particular mitigating circumstance but peremptorily instructed the jury that it was to find that defendant was under the influence of a mental or emotional disturbance and that

all of the evidence tends to show that at the time of the killing the defendant was under the influence of a mental or emotional disturbance *arising out of the state of his relationship with the victim.*

*Id.* at 393, 373 S.E.2d at 531 (alteration in original). In finding that the trial court in *Fullwood* met the requirements of *Lockett*, we held that "the court's instructions thus clearly allowed — indeed, required — the jury to consider defendant's relationship with the victim in determining defendant's sentence." *Id.*

In *State v. Lloyd*, 321 N.C. 301, 364 S.E.2d 316 (1988), *sentence vacated*, 488 U.S. 807, 102 L. Ed. 2d 18, *on remand*, 329 N.C. 662, 407 S.E.2d 218 (1991), the defendant contended that the trial court erred when it refused to submit two nonstatutory mitigating circumstances concerning his criminal record and, instead, over defendant's objection, submitted the statutory mitigating circumstance that defendant had "no significant history of prior criminal activity." *Id.* at 310, 364 S.E.2d at 324. We held that

[t]he submission of the mitigating circumstance "no significant history of prior criminal activity" coupled with the submission of the mitigating circumstance "any other circumstances arising from the evidence which the jury deems to have mitigating value" afforded the jury the flexibility necessary to give the defendant the benefit of any parts of his record it deemed of mitigating value. In light of the authority given to the jury to consider any and all facts of mitigating value, we conclude that the trial court properly instructed the jury regarding mitigating circumstances . . . .

*Id.* at 314, 364 S.E.2d at 325.

In *State v. Hill*, 331 N.C. 387, 417 S.E.2d 765, we held that the trial court erred when it refused to submit the nonstatutory mitigating circumstance that "defendant was a positive influence

on a behaviorally-emotionally handicapped child," but concluded that this error was harmless beyond a reasonable doubt under N.C.G.S. § 15A-1443(b). *Id.* at 416-17, 417 S.E.2d at 779-80. In reaching this conclusion, we reasoned that "[t]he jury was allowed to consider and must have given full consideration to all evidence of the defendant's positive influence on the child in question when the jury considered the good character and catch-all mitigating circumstances." *Id.* at 417, 417 S.E.2d at 780. In addition, "the particular mitigating evidence supporting this particular nonstatutory mitigating circumstance was of little import, given the overwhelming evidence supporting the defendant's conviction and the aggravating circumstances found by the jury." *Id.*

In *State v. Greene*, 324 N.C. 1, 376 S.E.2d 430 (1989), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603, *on remand*, 329 N.C. 771, 408 S.E.2d 185 (1991), the defendant contended that the trial court erred when it refused to submit three proposed circumstances as separate mitigating circumstances and, instead, incorporated his requested instructions into the instructions for the statutory mitigating circumstances of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2) (1988), and impaired capacity to conform one's conduct to the requirements of the law, N.C.G.S. § 15A-2000(f)(6) (1988). In addition, the court in *Greene* submitted the catchall mitigating circumstance of "any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value." *Greene*, 324 N.C. at 21, 376 S.E.2d at 442. We noted that the jury was allowed to consider the evidence that had been presented with regard to his proposed mitigating circumstances and held that "the refusal to submit the proposed circumstances separately and independently was within the dictates of constitutional precedent and was not error." *Id.* at 21, 376 S.E.2d at 443.

In *Skipper v. South Carolina*, where it was held that a defendant's ability to adjust to prison life is a relevant mitigating circumstance, the defendant and his former wife were allowed to testify briefly "that [he] had conducted himself well during the 7½ months he spent in jail between his arrest and trial." *Skipper*, 476 U.S. at 3, 90 L. Ed. 2d at 5. The defendant in that case was precluded, however, from introducing the testimony of two jailers and a regular visitor "that [he] had 'made a good adjustment' during his time spent in jail." *Id.* at 3-4, 90 L. Ed. 2d at 5-6. The trial court's ruling excluding this evidence was upheld by the Supreme Court of South Carolina. *State v. Skipper*, 285

STATE v. ROBINSON

[336 N.C. 78 (1994)]

S.C. 42, 48, 328 S.E.2d 58, 61-62 (1985), *judgment reversed*, 476 U.S. 1, 90 L. Ed. 2d 1 (1986). In reviewing the case, the Supreme Court of the United States stated that

> the only question before us is whether the exclusion from the sentencing hearing of the testimony petitioner proffered regarding his good behavior during the over seven months he spent in jail awaiting trial deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment.

*Skipper*, 476 U.S. at 4, 90 L. Ed. 2d at 6. It is thus apparent that the fact that the jury in *Skipper* was not allowed to hear the evidence at all was of concern to the Supreme Court. In the present case, however, the record reveals that defendant was not precluded from introducing any evidence concerning his conduct in prison or his ability to adjust to prison life.

Defendant's expert testified that she had reviewed defendant's Department of Correction custodial records and gave her opinion that

> Mr. Robinson functions quite well in the prison environment. That he is able to follow the rules on the vast majority of occasions. That he is able to get along with other inmates, sufficient to have had only one physical altercation with an inmate in four or five years in the Department of Corrections. And that he is able to live in that environment without disturbing or offending other people by his behavior.

In addition, the following mitigating circumstances, among others, were submitted to the jury:

> (4) That the defendant has a good prison record while incarcerated at Central Prison.
>
> . . . .
>
> (5) That the defendant has exhibited good behavior while a prisoner incarcerated at the Guilford County Jail in High Point, and has volunteered to serve meals to his fellow inmates and to perform other custodial duties such as mop the floor.

The trial court also submitted the catchall mitigating circumstance:

> (20) Any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value.

The jury responded "no" to each of these, indicating that no juror found any of these circumstances to exist and have mitigating value.

Although we acknowledge that it was error for the trial court to refuse to submit the mitigating circumstance that "[i]n a structured prison environment, Dwight Lamont Robinson is able to conform his behavior to the rules and regulations and performs tasks he is required to perform," any error was harmless beyond a reasonable doubt. A thorough examination of the record demonstrates that the failure to submit the specific mitigating circumstance requested by defendant does not raise a reasonable probability that a different result would have been reached at this sentencing hearing. The jury answered "no" to the mitigating circumstances that most directly reflected the evidence presented at trial, even after defendant's expert was allowed to give her testimony in its entirety. In addition, the submission of the two mitigating circumstances dealing with defendant's conduct in prison, as well as the catchall mitigator, allowed the jury to fully consider the evidence as presented by defendant. *See State v. Hill*, 331 N.C. 387, 417 S.E.2d 765.

The jury was not precluded from considering evidence of this mitigating circumstance. The evidence that supported this factor was presented to the jury, and it was allowed to consider the evidence in the context of the mitigating circumstances submitted by the trial court. Defendant's assignment of error on these grounds is overruled.

[16] In his next assignment of error, defendant contends that it was error for the trial court to exclude the testimony of certain witnesses who would have testified to defendant's background and character. The first of the State's objections to be sustained occurred during the following testimony given by defendant's sister, Felicia Hawkins:

Q. Ms. Hawkins, if you remember, if you recall, do you recall how your father treated you and your brothers and sisters, and Dwight specifically?

A. (No response.)

Q. Take your time.

A. Well, my father was an alcoholic.

Q. And as a result of being an alcoholic, how did he treat you?

A. If we would do anything, he would make me and my sister take our blouse off and beat us.

Q. And what did he beat you with?

MR. KIMEL: We object to what he might have done to her, your Honor, as far as that goes to mitigating factors.

THE COURT: Sustained.

Later, defendant sought to elicit testimony from his former wife:

Q. Do you know what this hearing is all about?

A. Yes, sir.

Q. What is it about?

MR. KIMEL: Object, your Honor.

THE COURT: Sustained.

Q. What is your attitude toward your husband at this time?

MR. KIMEL: Object to what her attitude is, your Honor.

Q. What is your feeling toward your husband at this time?

MR. KIMEL: Really object to that. It amounts to the same thing.

THE COURT: Sustained.

Defendant made no offer of proof at trial in order to preserve the witnesses' answers to the questions.

We note at the outset of this discussion that it is difficult to see what relevant information defendant was attempting to present through these lines of questioning, and the "context within which questions were asked" gives no indication of the particular relevance the responses may have had in preserving the rulings for review. N.C.G.S. § 8C-1, Rule 103(a)(2) (1992).

In the first instance, where defendant examined his sister, this Court cannot ascertain what relevance the father's treatment of defendant's sisters would have with regard to mitigation of defendant's crime. Although it is true that "[e]videntiary rules which would normally apply at the guilt phase of a trial do not necessarily apply with equal force at a sentencing hearing," *State v. Barts*,

321 N.C. 170, 180, 362 S.E.2d 235, 240 (1987), we have not yet abandoned all requirements for relevancy.

Even if it were possible for this Court to imagine a response to this question that would have relevance, such a response is certainly not apparent from the context of the examination. *See State v. Hester*, 330 N.C. 547, 411 S.E.2d 610 (1992). Accordingly, defendant is precluded from predicating error upon the trial court's ruling on the State's objection to the question. *See* N.C.G.S. § 8C-1, Rule 103(a)(2) (1992); N.C.G.S. § 15A-1446(a) (1988).

The same can be said in the second instance, where counsel inquired about defendant's wife's comprehension of the nature of a capital sentencing proceeding.

In the case of her attitude toward defendant, assuming *arguendo* that her attitude was relevant and would have had mitigating value, her feelings were made clear by her later testimony:

Q. Do you ever discuss their father [defendant] with the children?

A. Yes, sir.

Q. In what relationship?

A. I tell them that I miss their father, and that we need him. And, you know, we pray to God that he will come home, you know. It's—it's—we miss him very much, and we love him, and I know—I know a lot of people has been hurt behind this. I still don't know what it's all about.

But, like, the Page family, I know they're hurting, but so is my family. Me and my kids, my kids need their father. I need my husband.

I can't make up what has happened. All I can say is, I sympathize and I know what they're going through also, you know.

But it's—I know it's hard on everybody that's involved. But I, you know, it's just something very hard for us to deal with.

Defendant has shown no abuse of discretion in the trial court's sustaining of the State's objections to these questions; accordingly, defendant's assignment of error on these grounds is overruled.

STATE v. ROBINSON

[336 N.C. 78 (1994)]

JURY INSTRUCTIONS

[17] Defendant lists several assignments of error with regard to the jury instructions given at the close of the evidence. In the first of these, defendant contends that it was error for the trial court to instruct the jury that it could refuse to consider mitigating evidence if the jury deemed that the evidence had no mitigating value. Specifically, defendant complains about the instructions given to the jurors with regard to their consideration of nonstatutory mitigating circumstances. The trial court instructed the jury as follows:

Third, consider whether the defendant dropped out of school while he was in the seventh or eighth grade, and whether you deem this to have mitigating value.

You would find this mitigating circumstance if you find that the defendant dropped out of school while he was in the seventh or eighth grade, and that this circumstance has mitigating value.

If one or more of you finds by a preponderance of the evidence that this circumstance exists, and also is deemed mitigating, you would so indicate by having your foreperson write "Yes" in the space provided after this mitigating circumstance on the Issues and Recommendation form.

If none of you find the circumstance to exist, or if none of you deem it to have mitigating value, then you would so indicate by having your foreperson write "No" in that space.

These instructions were given in substantially the same form for all of the nonstatutory mitigating circumstances that were submitted to the jury. Defendant contends that these instructions unconstitutionally permitted the jury, as sentencer, to refuse to consider relevant mitigating evidence. We disagree.

The language of the instructions clearly permits and instructs the jury to consider any evidence of the nonstatutory mitigating circumstances, as required by *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, and *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1 (1982). As this Court noted in *State v. Fullwood*, however, "neither *Lockett* nor *Eddings* requires that the sentencer must determine that the submitted mitigating circumstance has mitigating value." *Fullwood*, 323 N.C. at 396, 373 S.E.2d at 533.

STATE v. ROBINSON

[336 N.C. 78 (1994)]

Accordingly, we rejected defendant's argument in *State v. Hill*, 331 N.C. at 418, 417 S.E.2d at 780 (no error for trial court to instruct jury that it must find whether each nonstatutory mitigating circumstance existed and then whether that circumstance had mitigating value). Defendant's assignment of error on these grounds is without merit.

[18]   In his next assignment of error, defendant contends that the trial court erred when it refused to submit the statutory mitigating circumstance that "defendant has no significant history of prior criminal activity." N.C.G.S. § 15A-2000(f)(1) (1988).

In making the determination of whether the submission of this mitigating circumstance is warranted, the trial court must "determine *whether a rational jury could conclude* that defendant had no *significant* history of prior criminal activity." *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988) (first emphasis added). If the trial court determines that a rational jury *could* so find, it is then up to the jury to decide whether this is the case. *Id.*

We found this factor *not* to have been properly submitted *ex mero motu* in *State v. Stokes*, 308 N.C. 634, 304 S.E.2d 184 (1983), and *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604, *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991).

In *State v. Stokes*, there was evidence that over a period of eight years, the defendant had engaged in five incidents of theft, three of which involved a break-in; an assault on a female; and one break-in apparently not involving theft. The defendant in *Stokes* also admitted that he had possessed, used, and sold marijuana on many occasions. *Stokes*, 308 N.C. at 653-54, 304 S.E.2d at 196.

In *State v. Artis*, there was evidence of a number of convictions, including

> assault on a female with intent to commit rape in 1957, assault on a female in 1967, assault on a female in 1974, escape and larceny of an automobile in 1961, misdemeanor larceny in 1974, driving while license revoked in 1974, 1975, and 1979, driving while under the influence in 1974 and 1979, driving with no operator's license in 1981, and assault with a deadly weapon in 1975.

*Artis*, 325 N.C. at 315, 384 S.E.2d at 491.

STATE v. ROBINSON

[336 N.C. 78 (1994)]

In the present case, the evidence showed that defendant had been involved in criminal activity since his adolescence. There was testimony from his wife that he had been a drug user since the age of thirteen and that he would sometimes make as much as $4,000 to $5,000 a week selling drugs. There was testimony indicating that defendant made his living selling drugs; he had been seen selling illegal drugs, including cocaine, marijuana, and PCP in the State of Maryland and in Thomasville and Winston-Salem, North Carolina.

In addition, three years prior to the murder in this case, defendant pled guilty to the robbery of a U-Haul center and two of its employees.

Finally, the jury heard the testimony of Thomas Wood, who detailed the circumstances of defendant's visit to North Carolina, how he had come down from Washington, D.C., armed with a pistol and supplied with a drug called "love-boat," marijuana laced with PCP and formaldehyde. Wood's testimony was that defendant had come to North Carolina to sell his "love-boat" for higher prices than were available in D.C. and that, while the men were on their journey to North Carolina, defendant revealed the other purpose for the venture: that he was intent on "making a lick." Defendant wandered about Winston-Salem to various liquor houses, selling drugs and using another man's driver's license as identification until it was time to rob the Western Steer.

We do not find it necessary to engage in any further comparison between this case and those cases in which we have determined the propriety of the submission or refusal to submit the circumstance at issue. We simply hold that based on the evidence of defendant's continuous, extensive, and recent involvement in criminal activity, including his use and sale of drugs and his conviction of a violent crime, no rational jury could have found that he had "no significant history of prior criminal activity." The jury, in fact, specifically found, as an aggravating circumstance, that defendant had been previously convicted of a felony involving the use or threat of violence to the person. The trial court did not err by not submitting this circumstance for the jury's consideration.

[19] In his next assignment of error, defendant contends that the jury instructions concerning the manner in which the jury was to weigh aggravating and mitigating circumstances prohibited individual jurors from considering mitigating circumstances found

STATE v. ROBINSON

[336 N.C. 78 (1994)]

by other jurors to exist. Defendant contends that the instructions are therefore unconstitutional according to *Lockett v. Ohio*, which held that a capital jury may not be precluded from considering, as a mitigating circumstance, any aspect of a defendant's character or record that he proffers as a basis for a sentence less than death. *Lockett*, 438 U.S. at 604, 57 L. Ed. 2d at 990.

The instructions at issue here are those that concerned Issue Four of the Issues and Recommendation as to Punishment form that was completed by the jury in this case. Issue Four of this form requires the jury to consider whether the aggravating circumstances, when considered with the mitigating circumstances, are sufficiently substantial to call for the imposition of the death penalty.

The instructions given to the jury with regard to how to determine this issue were as follows:

In deciding this issue, you are not to consider the aggravating circumstances standing alone. You must consider them in connection with any mitigating circumstance found by one or more of you.

When making this comparison, each juror may consider any mitigating circumstance or circumstances that juror determined to exist by a preponderance of the evidence.

Defendant contends that each juror should consider any mitigating circumstance found by *any* of the jurors when weighing the aggravating and mitigating circumstances and that these instructions violate the rule in *McKoy v. North Carolina* that a sentencing jury may not be precluded from giving full and free consideration to evidence of mitigation. *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). We decided this issue otherwise in *State v. Lee*, 335 N.C. 244, 439 S.E.2d 547 (1994). In that case, we stated that

Were we to adopt this reading of *McKoy* and its progenitors, we would create an anomalous situation where jurors are required to consider mitigating circumstances which are only found to exist by a single holdout juror. We do not believe that the decisions in *McKoy* or *Mills* intended this anomalous result. The jury charge given in this case did not preclude the jurors from giving effect to all mitigating evidence they found to exist.

*Id.* at 287, 439 S.E.2d at 570. We continue to adhere to our decision in *Lee*, and for the foregoing reasoning, defendant's assignment of error on this issue is overruled.

[20] In a related assignment of error, defendant contends that this instruction, which is given to the jury in similar form for Issue Three, is flawed because it instructs the jury that it *"may* consider any mitigating circumstance or circumstances that juror determined to exist." (Emphasis added.) Defendant contends that this instruction violates the rule that a juror may not be precluded from considering mitigating evidence. However, in both Issues Three and Four, prior to those portions of the instructions about which defendant complains, the jury is first instructed that it *"must"* consider the aggravating and mitigating circumstances.

Again, this issue was decided adversely to defendant in *State v. Lee*, where we stated that

> The rule of *McKoy* is that jurors may not be prevented from considering mitigating circumstances which they found to exist in Issue Two. Far from precluding a juror's consideration of mitigating circumstances he or she may have found, the instant instruction expressly instructs that the evidence in mitigation *must* be weighed against the evidence in aggravation.

335 N.C. at 287, 439 S.E.2d at 569-70. Accordingly, defendant's assignment of error on this issue is overruled.

[21] In his next assignment of error, defendant contends that the trial court erroneously instructed the jury with regard to the concept of mitigation. The trial court instructed the jury as follows:

> A mitigating circumstance is a fact or group of facts which do not constitute a justification or excuse 'for a killing, or reduce it to a lesser degree of crime than first degree murder, but which may be considered as extenuating or reducing the moral culpability of the killing, or making it less deserving of extreme punishment than other first degree murders.

Defendant argues that by focusing the jury's attention on the killing itself, this instruction limited the jury's ability to consider defendant's character and background as a basis for a sentence less than death. We disagree. After the instruction above was given, the jury was instructed:

STATE v. ROBINSON

[336 N.C. 78 (1994)]

> Our law identifies several possible mitigating circumstances. However, in considering Issue Two, it would be your *duty to consider as a mitigating circumstance any aspect of the defendant's character or record,* and any of the circumstances of this murder that the defendant contends is a basis for a sentence less than death, and any other circumstance arising from the evidence which you deem to have mitigating value.

(Emphasis added.) In addition, the jury was instructed that it should consider the catchall mitigating circumstance, "[a]ny other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value."

We hold that the instructions as given, which are virtually identical to the North Carolina Pattern Jury Instructions, are a correct statement of the law of mitigation. The instructions here are identical to those instructions that we held in *State v. Artis* to be "a correct statement of the law." 325 N.C. at 326, 384 S.E.2d at 497. They did not preclude the jury from considering any aspect of defendant's character which he may have presented as a basis for a sentence less than death. Defendant has shown no basis for relief on this assignment of error.

[22] In defendant's fourth challenge to the pattern jury instructions for the weighing of mitigating and aggravating circumstances, defendant contends that the instructions given for Issue Three unconstitutionally prohibited an individual juror from considering mitigating circumstances found in Issue Two. The transcript reveals that the following instruction was given to the jury:

> Issue Three, which appears there at the bottom of Page Five,· reads as follows: "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is or are insufficient to outweigh the aggravating circumstance or circumstances found?"
>
> If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances. When deciding this issue, each juror may consider any mitigating circumstance or circumstances that the *jury* determined to exist by a preponderance of the evidence in Issue Two.

(Emphasis added.) The pattern jury instruction, which has been approved by this Court, reads: "each juror may consider any

mitigating circumstance or circumstances that the *juror* determined to exist." N.C.P.I. — Crim. 150.10, at 42 (1993) (emphasis added).

It is difficult to determine whether the use of the word "jury" as opposed to the word "juror" is a case of *lapsus linguae* on the part of the trial court or a mistake in the transcription of the trial court's instruction. In either event, any error was harmless beyond a reasonable doubt.

The jury was clearly and unambiguously instructed for each of the twenty mitigating circumstances submitted in Issue Two that only one or more of the jurors was required to find that the mitigating circumstance existed and that it was deemed mitigating. Thus, in order for the "jury" to find the existence of a mitigating circumstance, it was expressly clear that only one juror was required to find that circumstance. The jurors were then instructed in Issue Three that "[i]f you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances." No individual juror was therefore precluded in Issue Three from considering mitigating evidence that that juror alone found in Issue Two. Defendant is not entitled to a new sentencing hearing on the basis of this assignment of error.

[23] In his next assignment of error, defendant contends that the trial court erred when it failed to instruct the jury on the meaning of life imprisonment.

During the charge conference, counsel for defendant made the following request for instruction: "The defendant hereby moves the Court to instruct the jury that the term 'life imprisonment' means life imprisonment and give no other definition and explanation." The trial court denied the request but stated that "if the jury asks the question, the Court would intend to instruct them in accordance with the case law." Defendant made no further request for this instruction, nor did the jury inquire about the meaning of a life sentence.

This Court has held that if the question of eligibility for parole arises during jury deliberations, the jury is to be instructed

> that the question of eligibility for parole is not a proper matter for the jury to consider and . . . that in considering whether they should recommend life imprisonment, it is their duty to determine the question as though life imprisonment means

exactly what the statute says: "imprisonment for life in the State's prison" . . . .

*State v. Conner,* 241 N.C. at 471-72, 85 S.E.2d at 587. We have not held that the jury is to be so instructed in the absence of such inquiry. To do so would unnecessarily present the issue of parole to the jury, absent any indication that the jury was considering that possibility. In addition, the instruction requested by defendant is an inaccurate statement of the law. It is not the same as the *Conner* instruction, which directs that the jury should consider the term life imprisonment "*as though* life imprisonment means exactly what the statute says." *Id.* (emphasis added). In addition, the purpose of the *Conner* instruction is to instruct the jury that it is to eliminate the possibility of parole from consideration. *Id.* To give the instruction requested by defendant and nothing more would not be in keeping with this principle.

Absent jury inquiry as to the meaning of a life sentence or an inquiry as to the eligibility of defendant for parole, the trial court should not instruct the jury as to how it is to consider the meaning of the term "life imprisonment." Defendant's assignment of error on this issue is overruled.

[24] In his next assignment of error, defendant contends that the trial court erred in denying his motion for appropriate relief filed pursuant to N.C.G.S. § 15A-1414. In his motion for appropriate relief, defendant alleged that the jury's recommendation of the death penalty was the result of juror misinformation about his parole eligibility in the event a life sentence was imposed. With his motion, defendant included affidavits from jurors, at least one of whom indicated that she believed "that Mr. Robinson would be released on parole within five or ten years" and that had she "been informed that on a first degree life sentence the defendant would not have been eligible for parole until after he had served a minimum of twenty-five years, [she] would have voted that he receive a life sentence." The trial court ruled that the affidavits were inadmissible under N.C.G.S. § 8C-1, Rule 606(b), which reflects the common law rule that affidavits of jurors are inadmissible for the purposes of impeaching the verdict except as they pertain to extraneous influences that may have affected the jury's decision. *See* N.C.G.S. § 8C-1, Rule 606(b), official commentary (1986). The trial court then denied defendant's motion and ruled that "discussions about the parole eligibility of the defendant are 'internal

influences' on a jury coming from the jury themselves [sic] and cannot be considered as a basis of relief." We hold that the trial court correctly denied defendant's motion for relief.

We addressed this same question in *State v. Quesinberry*, 325 N.C. 125, 381 S.E.2d 681, *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603, *on remand*, 328 N.C. 288, 401 S.E.2d 632 (1991). In *Quesinberry*, this Court distinguished between "external" and "internal" influences on jury deliberations. Internal influences were defined as "information coming from the jurors themselves—'the effect of anything upon [a] juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith.'" *Id.* at 134, 381 S.E.2d at 687 (quoting Fed. R. Evid. 606(b) ). External influences were defined as "'information dealing with the defendant or the case which is being tried, which information reaches a juror without being introduced in evidence. It does not include information which a juror has gained in his experience which does not deal with the defendant or the case being tried.'" *Id.* at 135, 381 S.E.2d at 688 (quoting *State v. Rosier*, 322 N.C. 826, 832, 370 S.E.2d 359, 363 (1988) ). We specifically held that "allegations that jurors considered defendant's possibility of parole during their deliberations are allegations of 'internal' influences on the jury." *Id.* Again, Rule 606(b) prohibits juror testimony that impeaches a jury verdict on the basis of internal influences. As in *Quesinberry*, there are no allegations of improper external influences as being the cause of the jury's decision in this case. The trial court correctly refused to consider the affidavits of the jurors, and properly denied defendant's motion for relief on these grounds.

[25] In the alternative, defendant contends that he was entitled to at least an evidentiary hearing on his motion. We disagree. When a motion for appropriate relief is filed pursuant to N.C.G.S. § 15A-1414, an evidentiary hearing is not required, "but the court may hold an evidentiary hearing if it is appropriate to resolve questions of fact." N.C.G.S. § 15A-1420(c)(2) (1988). In addition, "[t]he court must determine the motion without an evidentiary hearing when the motion and supporting and opposing information present only questions of law." N.C.G.S. § 15A-1420(c)(3) (1988). In this case, the trial court correctly determined that the juror affidavits supporting the motion were inadmissible. This Court has unequivocally held that "[a]llowing jurors to impeach their verdict by revealing their 'ideas' and 'beliefs' influencing their verdict is not supported

STATE v. ROBINSON

[336 N.C. 78 (1994)]

by case law, nor is it sound public policy." *Quesinberry*, 325 N.C. at 136, 381 S.E.2d at 688. The trial court properly determined that, as a matter of law, defendant was not entitled to relief. No evidentiary hearing was required. Accordingly, defendant's assignments of error on these grounds are overruled.

In his next assignment of error, defendant contends that the trial court erred in failing to correct the prosecutor's improper closing statement, where he argued: (1) a need for the jury to kill defendant to deter crime, (2) an appeal to community sentiment, and (3) facts not supported by the evidence. Defendant also contends that the prosecutor argued a nonstatutory aggravating circumstance based on allegations of drug use and improper racial comments.

Defendant did not object to these portions of the prosecutor's argument at trial. Accordingly, our review of the arguments is limited to a determination of whether the arguments amounted to gross impropriety requiring the trial court to intervene *ex mero motu*. "[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979).

[26] With respect to defendant's contention that the prosecutor improperly argued the need for the jury to sentence defendant to death in order to deter crime, the prosecutor argued the following:

The Supreme Court has said that there is a rising tide of criminality. "Whether the imposition of the death penalty of any case or such a case would be futile is necessarily a matter of opinion about which reasonable and responsible minds do differ. The steadily rising tide of crimes of the most serious nature throughout the nation has occurred in an era of unprecedented permissiveness in our society, and an emphasis on sympathy for the accused rather than for the victim and those endangered by him."

This is the Supreme Court talking. "This is ample basis for reasonable men to conclude that some punishment of exceptionally vicious crimes other than imprisonment coupled with carefully organized programs of rehabilitation designed to in-

sure the prisoner that he has the sympathy of society is necessary to bring about the turning of the tide, the turning of the tide of cruel and vicious crimes."[1]

Defendant argues that this argument was an improper request for the jury to sentence defendant to die in order to deter the crimes of others. We have held that arguing the general deterrent effect of the death penalty to the jury is improper. *State v. Kirkley*, 308 N.C. 196, 215, 302 S.E.2d 144, 155 (1983), *overruled on other grounds by State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988); *see also State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 341 (1993), *reh'g denied*, --- U.S. ---, 126 L. Ed. 2d 707 (1994). In so holding, however, we specifically noted that to do so was not so grossly improper that it warranted *ex mero motu* intervention by the trial court. *Kirkley*, 308 N.C. at 215, 302 S.E.2d at 155. Accordingly, even if the prosecutor's argument could be construed as argument about the general deterrent effect of the death penalty, no intervention on the part of the trial court was required. Defendant's assignment of error on these grounds is overruled.

[27] With regard to defendant's contention that the prosecutor made an improper argument appealing to community sentiment, the prosecutor argued the following:

> Now, this is your choice, this is your opportunity as jurors. You are the voice and the conscience of your community here in Guilford County.
>
> Are the illegal activities of Mr. Robinson, are they your accepted standards, or do you have different standards? If not this case for capital punishment, what case? If not this set of circumstances, what set of circumstances?
>
> Are we going to have Stratford Woods apartments, Stratford Woods law across the country and across Guilford County?
>
> . . . .
>
> Do you accept murder and robbery in your county? You speak for the community. Your verdict should reflect the com-

---

1. The prosecutor's statements came from *State v. Jarrette*, 284 N.C. 625, 665, 202 S.E.2d 721, 747 (1974), *vacated in part*, 428 U.S. 903, 49 L. Ed. 2d 1206 (1976).

munity. It shouldn't reflect what Dr. Royal thinks or anyone else thinks. It's your verdict. It's how you look at it.

Defendant contends that this argument improperly asked the jury to decide defendant's punishment based on community sentiment. See State v. Scott, 314 N.C. 309, 333 S.E.2d 296 (1985).

In Scott, this Court held that arguments designed to convince the jury to convict a defendant due to public sentiment against crime were improper. Id. at 312, 333 S.E.2d at 298. We have, however, held that a reminder to the jury that for purposes of the present trial, it acts as the voice and conscience of the community is not improper. State v. Harvell, 334 N.C. 356, 362, 432 S.E.2d 125, 128 (1993). In the case at hand, the prosecutor explained to the jurors that they were the voice and conscience of the community. In addition, the prosecutor told the jurors that it was their responsibility to make a decision by reminding the jurors: "It's your verdict. It's how you look at it." Thus, the State did not tell the jurors to decide defendant's punishment based on community sentiment, but rather told the jurors that they were to act as the voice of the community. Accordingly, defendant's assignment of error on these grounds is overruled.

[28] With respect to defendant's contention that the prosecutor's closing argument was not supported by the evidence, the prosecutor argued the following:

The defendant is entitled to put on evidence of mitigating factors, factors which don't lessen the degree of the crime but, as the Judge will charge you, they will contend in some way mitigates the crime, or reduces the defendant's moral culpability for this crime, and you must consider these if any one of you finds that it [sic] does exist.

And I contend to you that defendant's mitigating factors can be pretty much grouped into categories like "Society made me do it," or "My family made me do it." Nothing but a complete evasion of responsibility by this man.

Defendant contends that the prosecutor misstated the law regarding mitigation in order to frustrate and impair the jury's consideration of the evidence, specifically, defendant's deprived background, childhood, and familial relationships.

A jury has a duty to examine the character of the defendant and the circumstances of the crime in making its sentencing decision. *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235 (1983). A jury argument is proper as long as it is consistent with the record and not based on conjecture or personal opinion. *State v. Zuniga*, 320 N.C. 233, 253, 357 S.E.2d 898, 911, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987).

In the case *sub judice*, defendant's witnesses testified that defendant was abused by his father. Furthermore, Dr. Royal, defendant's expert witness, testified that defendant's parents were alcoholics and that defendant had sustained physical abuse at the hands of his father. Also, this expert witness testified that defendant was a member of an inner-city culture where illegal activities are the accepted standard.

The prosecutor attempted to rebut these factors by arguing that defendant would use them in an attempt to evade responsibility for his acts by blaming society and his family situation as a child. In so doing, the prosecutor did not misstate the law of mitigation, nor did he rely on facts not in evidence.

We are not persuaded by defendant's argument that the prosecutor's characterization of defendant's evidence in mitigation as an "evasion of responsibility" was a depreciation of mitigating evidence so improper that it required *ex mero motu* intervention by the trial court. This remark was directed toward the weight that the jury should give to defendant's evidence, and as such, the comment was not improper. *See State v. Kirkley*, 308 N.C. at 214, 302 S.E.2d at 154. Defendant's assignment of error on these grounds is without merit.

[29] Defendant's final contention concerning the prosecutor's argument is that the prosecutor's references to drugs and race were improper. With respect to what defendant contends were improper racial comments, the prosecutor argued the following:

> Well, that's fine, but he didn't have to put his culture down here with us. What this means is that anyone who is poor and black and lives in an inner city has a license to commit murder, because it's not their fault. That none of these folks can ever rise above where they start out. Because they are poor, they are black, and they come from an inner city, they have no right, they have no way, that's it.

And they have a license to commit crime, because that's just what happens there, and there's nothing you can do about it. That's what their doctor says.

The prosecutor was responding to the testimony of defendant's expert, who gave testimony indicating that defendant's inner-city upbringing was, in part, a cause of his criminal behavior. In so doing, the prosecutor argued that defendant's race was not the cause of his criminal behavior and should not serve as an excuse. We do not find this portion of the prosecutor's closing argument to be improper, and it certainly did not require intervention on the part of the trial court.

[30] Defendant further contends that the prosecutor's assertion that defendant's use of drugs later in the evening of the murder was a factor that "calls out . . . for the imposition of the death penalty" should have been prevented by the trial court. The portion of the prosecutor's argument about which defendant complains was as follows:

> Do you recall Gary Chaney's testimony about these folks as they did the dope in the room? If I'm not mistaken, Mr. Robinson, Mr. Gantt and Mr. Wood all did their drugs intravenously by arm — you know, with a needle and works in their arm. And do you recall how he described Mr. Robinson coming out of the other room?
>
> He said, "Well, you know, he came out of the other room with a needle in his arm, dancing to the music." Now, this is a man who has just murdered a citizen, who has just shot two other people in the head. And scarcely two hours later, he's coming out of a room with a needle in his arm, dancing to the music.

The General Assembly has codified permissible circumstances in aggravation upon which a jury can recommend a sentence of death. N.C.G.S. § 15A-2000(e) (1988). Drug use is not one of these factors; thus, defendant argues that the prosecutor's argument was improper.

While lack of remorse is not a statutory aggravating circumstance, a prosecutor's comment on a defendant's lack of remorse is proper. *State v. Price*, 326 N.C. 56, 388 S.E.2d 84, *sentence vacated*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990), *on remand & sentence reinstated*, 331 N.C. 620, 418 S.E.2d 169 (1992), *sentence vacated*, --- U.S. ---, 122 L. Ed. 2d 113, *on remand & sentence reinstated*,

STATE v. ROBINSON

[336 N.C. 78 (1994)]

334 N.C. 615, 433 S.E.2d 746 (1993), *sentence vacated*, --- U.S. ---, --- L. Ed. 2d ---, 1994 WL 287581 (30 June 1994). Reviewing this portion of the State's closing argument in context, we see that the statement, "scarcely two hours later, he's coming out of a room with a needle in his arm, dancing to the music," was offered to show defendant's lack of remorse, not to offer drug use as an aggravating circumstance. Defendant is not entitled to relief on this assignment of error.

PRESERVATION ISSUES

[31] Defendant raises three issues that he admits have been previously decided against him by this Court. In the first of these, defendant contends that the trial court erred in allowing the prosecutor to exercise peremptory challenges against those jurors who expressed reservations about imposing the death penalty. Defendant acknowledges that this issue was decided against him in *State v. Allen*, 323 N.C. 208, 372 S.E.2d 855 (1988), *sentence vacated*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand & sentence reinstated*, 331 N.C. 746, 417 S.E.2d 227 (1992), *cert. denied*, --- U.S. ---, 122 L. Ed. 2d 775, *reh'g denied*, --- U.S. ---, 123 L. Ed. 2d 503 (1993).

[32] In the next of these assignments of error, defendant contends that the pattern jury instruction that imposes a duty upon the jury to return a recommendation of death if it finds that the mitigating circumstances are insufficient to outweigh the aggravating circumstances is unconstitutional. Defendant acknowledges that this Court has held to the contrary in *State v. Pinch*, 306 N.C. 1, 292 S.E.2d 308; *see also State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308 (1983), *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983).

[33] In the last of these assignments of error, defendant contends that the trial court erred when it denied defendant's motion for individual *voir dire* and sequestration of individual jurors. Defendant acknowledges that this Court has consistently denied relief on this basis. *See, e.g., State v. Reese*, 319 N.C. 110, 353 S.E.2d 352 (1987); *State v. Wilson*, 313 N.C. 516, 330 S.E.2d 450 (1985); *State v. Johnson*, 298 N.C. 355, 259 S.E.2d 752.

After careful consideration of each of these issues, we continue to adhere to our previous decisions and overrule each of these assignments of error.

PROPORTIONALITY REVIEW

[34] In the guilt-innocence phase of defendant's first trial, we found no error. *State v. Robinson*, 330 N.C. 1, 409 S.E.2d 288. In our review of defendant's second capital sentencing proceeding, we have found no error. It is now the duty of this Court to review the record and determine (1) whether the record supports the jury's finding of the aggravating circumstances upon which the sentencing court based its sentence of death; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1988).

The following aggravating circumstances were submitted to the jury:

(1) Has the defendant been previously convicted of a felony involving the use or threat of violence to the person?

. . . .

(2) Was this murder committed while the defendant was engaged in the commission of robbery?

. . . .

(3) Was this murder part of a course of conduct in which the defendant engaged and did that course of conduct include the commission by the defendant of other crimes of violence against other persons?

The jury responded "yes" to each of these inquiries, thus finding these aggravating circumstances.

We have conducted a thorough review of the transcript, record on appeal, briefs, and oral arguments of counsel, and we conclude that the jury's finding of each of these aggravating circumstances was supported by the evidence.

We further conclude that nothing in the record suggests that the jury sentenced defendant to death while under the influence of passion, prejudice, or any other arbitrary factor.

Our final duty is to determine whether the punishment of death in this case is proportionate to other cases in which we

STATE v. ROBINSON

[336 N.C. 78 (1994)]

have affirmed the death penalty. *State v. Jennings*, 333 N.C. 579, 629, 430 S.E.2d 188, 214-15, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 602 (1993); *State v. Brown*, 315 N.C. 40, 70, 337 S.E.2d 808, 829 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988).

As this Court has frequently noted, the purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In so doing, proportionality review serves as "a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980).

In conducting proportionality review, " '[we] determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant.' " *State v. McHone*, 334 N.C. 627, 646, 435 S.E.2d 296, 307 (1993) (quoting *State v. Brown*, 315 N.C. at 70, 337 S.E.2d at 829), *cert. denied*, --- U.S. ---, 128 L. Ed. 2d 220 (1994).

> "In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and the defendant's character, background, and physical and mental condition."

*State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993) (quoting *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985) ).

The pool of cases that this Court uses for comparative purposes consists of

> "*all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the

jury's failure to agree upon a sentencing recommendation within a reasonable period of time."

*State v. Syriani,* 333 N.C. 350, 400, 428 S.E.2d 118, 146 (quoting *State v. Williams,* 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied,* 464 U.S. 1004, 78 L. Ed. 2d 704 (1983)).

We first compare the instant case to those cases in which this Court has determined the sentence of death to be disproportionate.

This Court has thus far held the sentence of death to be disproportionate in seven cases: *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

In *State v. Benson,* the conviction was based solely on the felony murder theory; the victim died of cardiac arrest after being robbed and shot in the legs by the defendant. Only one aggravating circumstance was found: that the crime was committed for pecuniary gain. In holding that the sentence of death was disproportionate, we noted that "[f]rom the evidence it appears that [the defendant] intended only to rob; he fired at [the victim's] legs rather than a more vital part of his body." *Benson,* 323 N.C. at 329, 372 S.E.2d at 523. The defendant in *Benson* "also pleaded guilty during the trial and acknowledged his wrongdoing before the jury." *Id.* at 328, 372 S.E.2d at 523.

In *State v. Stokes,* the Court took notice of the fact that Stokes' accomplice in the crime was not sentenced to death, although they "committed the same crime in the same manner." *Stokes,* 319 N.C. at 21, 352 S.E.2d at 664. Only one aggravating circumstance was found in that case, that the murder was especially heinous, atrocious, or cruel.

In *State v. Rogers,* the only aggravating circumstance found was that the killing was part of a course of conduct in which the defendant engaged and which included the commission of other crimes of violence against other persons. *Rogers,* 316 N.C. at 236,

STATE v. ROBINSON

[336 N.C. 78 (1994)]

341 S.E.2d at 732. This Court emphasized the fact that those cases in which the sentence of death was predicated on this aggravating circumstance alone involved facts considerably more egregious than those in *Rogers*. *Id.* at 236, 341 S.E.2d at 733.

In *State v. Young*, a robbery-murder case, this Court took notice that the facts of the case "more closely resemble[d] those cases in which the jury recommended life imprisonment than those in which the defendant was sentenced to death." *Young*, 312 N.C. at 688, 325 S.E.2d at 193. We specifically stated that we had reviewed the armed robbery cases in which this Court had affirmed the death penalty, but concluded that we were "convinced that defendant Young did not commit a crime as egregious as those." *Id.* at 691, 325 S.E.2d at 194.

In *State v. Hill*, the defendant shot a police officer while engaged in a struggle near defendant's automobile. We specifically found that the crime was not especially heinous, atrocious, or cruel; was not of a torturous, sadistic, or bloodthirsty nature; was not part of a violent course of conduct; was not committed in the perpetration of another felony; and that there was no evidence that the defendant calculated or planned the commission of the crime. *Hill*, 311 N.C. at 478, 319 S.E.2d at 171. In addition, we noted that some of the eyewitness testimony was "less than crystal clear," *id.*, and concluded:

> Given the somewhat speculative nature of the evidence surrounding the murder here, the apparent lack of motive, the apparent absence of any simultaneous offenses, and the incredibly short amount of time involved, together with the jury's finding of three mitigating circumstances tending to show defendant's lack of past criminal activity and his being gainfully employed, and the unqualified cooperation of defendant during the investigation, we are constrained to hold as a matter of law that the death sentence imposed here is disproportionate within the meaning of G.S. 15A-2000(d)(2).

*Id.* at 479, 319 S.E.2d at 172.

In *State v. Bondurant*, the defendant inexplicably shot his friend in the head with a pistol after taunting the victim, saying, " 'You don't believe I'll shoot you, do you?' " *Bondurant*, 309 N.C. at 677, 309 S.E.2d at 173. Immediately after shooting the victim, however, defendant directed that the victim be taken to the hospital

STATE v. ROBINSON

[336 N.C. 78 (1994)]

and accompanied him there. While at the hospital, defendant spoke with police officers about the incident. In *Bondurant*, we held that the sentence of death did " 'not rise to the level of those murders in which we have approved the death sentence upon proportionality review.' " *Id.* at 693, 309 S.E.2d at 182 (quoting *State v. Jackson*, 309 S.E.2d at 46, 305 S.E.2d at 717). We noted that defendant did not kill the victim in the perpetration of another felony, that he did not coldly calculate the commission of the crime for a long period of time, and that it was not a torturous murder. *Id.* In addition, we found it important that "immediately after he shot the victim, [defendant] exhibited a concern for [the victim's] life and remorse for his action by directing the driver of the automobile to the hospital." *Id.* at 694, 309 S.E.2d at 182.

In *State v. Jackson*, the defendant flagged down the victim's car and rode off with him after telling his companions that he intended to rob the man. The defendant met up with his companions later and told them that he had robbed and killed the man. The victim was later found dead in the automobile. In finding that the sentence of death was disproportionate, we emphasized the fact that there was "no evidence of what occurred after defendant left with [the victim]" in his automobile. *Jackson*, 309 N.C. at 46, 305 S.E.2d at 717.

We find no significant similarity between the instant case and those in which we have found the death penalty to be disproportionate as a matter of law.

In this case, defendant deliberately set out to rob the Western Steer Steakhouse and would not be dissuaded by his companions. There was evidence that defendant had come down from Washington, D.C., for the 'specific purpose of committing some crime as well as to sell drugs. His scheme was not the result of drug or alcohol intoxication; the evidence showed that he purposefully abstained from the use of drugs and alcohol on the day of the killing in order, presumably, to increase his chances for success in whatever criminal endeavor he eventually decided upon.

He roamed about the High Point area looking for a suitable target. Once he decided upon the Western Steer, he executed his deliberated plan to rob the restaurant. He surprised his victims outside the restaurant; ordered them back inside at gunpoint; and made the two teenagers, Gene Hill and Tammy Cotner, lie on the floor. He ordered the manager, Robert Page, to open the safe.

STATE v. ROBINSON

[336 N.C. 78 (1994)]

When Mr. Page was unable to open the safe, defendant shot him in the leg and forced him to continue, in tears, with his struggle to recall and correctly enter the combination. Mr. Page was finally successful in his attempts to open the safe. Defendant threw Mr. Page out of the way and took out two money bags. He then forced all three victims to the back of the restaurant, personally dragging Mr. Page, who was unable to walk due to the wound in his leg, fifty feet down the hall. Defendant forced the victims to lie on the floor. His accomplice suggested that they lock them up in the meat cooler, which was just across the room. Defendant reflected on this idea for a "minute or two" and then decided that he did not have time for that. Defendant did, however, have time to stalk about the room and, one by one, personally shoot each of the victims in the head, killing Mr. Page and seriously wounding Gene Hill and Tammy Cotner.

There is no evidence whatsoever that defendant showed any remorse for his actions or ever sought medical attention for his victims. To the contrary, the evidence shows that within hours of the murder, defendant celebrated by purchasing cocaine with the proceeds of the robbery. He disappeared into a motel bathroom to inject the drugs and emerged with the needle dangling from his arm, dancing to some music.

There is no evidence whatsoever that defendant cooperated with the police in the investigation. In fact, when it came time for his arrest, he barricaded himself in his Maryland home and had to be forced out by the use of a S.W.A.T. team and a trained dog.

The details of the event in question are not in dispute. Accounts of the crime were given by defendant's own accomplice and by the surviving witnesses to the ordeal.

Simply put, the evidence shows a senseless, brutal, and willful murder committed for the purpose of concealing defendant's own pre-planned and deliberated robbery. In addition, it is manifestly clear that defendant intended the death of all three victims, not just Mr. Page.

In this case, the jury found each of the three submitted aggravating circumstances: that defendant had been previously convicted of a felony involving the use of violence to the person, that the murder was committed while defendant was engaged in the commission of robbery, and that the murder was part of a

STATE v. ROBINSON

[336 N.C. 78 (1994)]

course of conduct in which defendant engaged and which included the use of violence against other persons.

Of the twenty mitigating circumstances submitted, the jury found nine, only one of which was a statutory mitigating circumstance.[2] The jury refused to find that defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired. N.C.G.S. § 15A-2000(f)(6) (1988).

As support for the proposition that his sentence of death is disproportionate, defendant argues that the majority of robbery-

---

2. The jury found that the murder was committed while defendant was under the influence of mental or emotional disturbance. N.C.G.S. § 15A-2000(f)(2).

The jury found the following nonstatutory mitigating circumstances:

(7) That the defendant functions at an intellectual age of eight to ten years old, has an IQ of 70, and is borderline mentally retarded.

. . . .

(8) That the defendant has been an abuser of drugs since the age of twelve or thirteen.

. . . .

(11) That the defendant suffered during his early childhood and adolescent years as a result of a lack of love and nurturing from his parents.

. . . .

(13) That during his formative and later years as a child, the defendant suffered emotionally and mentally as a result of his parents' alcohol abuse and other behavioral problems.

. . . .

(15) That the defendant, in his early teens, was abandoned by his parents on more than one occasion, and during those occasions he assisted in the care of his siblings.

. . . .

(16) That the defendant's early developmental years were in the inner city culture, with a dysfunctional family.

. . . .

(18) That the defendant has an adjustment disorder with mixed emotions.

. . . .

(19) That the defendant has a personality disorder not otherwise specified.

murder cases have resulted in sentences of life imprisonment. We are not persuaded by this argument. It is true that our task on proportionality review is to compare the case "with other cases in the pool which are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. at 648, 314 S.E.2d at 503. However, in our assessment of whether a case is proportionate to other death-affirmed cases, this Court's attention is focused upon an "independent consideration of the individual defendant and the nature of the crime or crimes which he has committed." *State v. Pinch*, 306 N.C. at 36, 292 S.E.2d at 229. In addition, we have often stated that we reject any mechanical or empirical approach to the comparison of cases that appear superficially similar.

We have said many times that this Court does not "necessarily feel bound . . . to give a citation to every case in the pool of 'similar cases' used for comparison. . . . The Bar may safely assume that we are aware of our own opinions filed in capital cases arising since the effective date of our capital punishment statute, 1 June 1977." *State v. Williams*, 308 N.C. at 81, 82, 301 S.E.2d at 356. Nevertheless, it is helpful to identify cases that bear resemblance to the instant case in certain pertinent respects.

One such case is *State v. Oliver*, 309 N.C. 326, 307 S.E.2d 304 (1983). In *Oliver*, the defendant and his accomplice robbed a convenience store. The accomplice shot the shopkeeper, and as the men ran through the parking lot, the defendant shot and killed a man who was putting gas in his truck. In affirming the death penalty, this Court noted that ·

[t]he motive of witness elimination lacks even the excuse of emotion. We are persuaded by the fact, as we were in *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, that the [victim's] murder was the result of a deliberate plan to seek out a business establishment to rob and, without the slightest provocation or excuse, to callously and in cold blood shoot at close range anyone unfortunate enough to be present at the time.

*Id.* at 375, 307 S.E.2d at 335.

The murder at issue here is even more brutal and callous than that in *Oliver*. In *Oliver*, the victim was shot as the defendants fled the scene of the crime. In the present case, the victims endured the horrendous experience of being held at gunpoint as defendant went about the task of looting the restaurant safe. In doing so,

he cold-bloodedly shot Mr. Page in the leg while the two teenagers lay on the floor, presumably wondering if defendant intended to kill them all. These fears eventually materialized when defendant moved from witness to witness, systematically shooting each in the head.

In *State v. Lawson*, 310 N.C. 632, 314 S.E.2d 493, the victims encountered the defendant as he was in the process of burglarizing the home of one of the victims. Defendant shot the first victim in the head when the victim ran over to the patio of the house. Defendant forced the second victim out of his truck and shot him in the head as well, although this victim survived. In affirming the sentence of death, we noted that "[b]oth the murder and the attempted murder were accomplished as a result of defendant's careful, cold and calculated determination that he would prefer murdering these persons to risking their being able to testify against him and possibly send him back to prison." *Id.* at 648, 314 S.E.2d at 503.

In the instant case, the facts show that defendant's determination to murder the witnesses was made after as much or more consideration than in *Lawson*. Defendant's own accomplice even suggested an alternative to their deaths, that they be put in the restaurant's meat cooler. Instead, defendant deliberately made the decision that they should all be killed.

Finally, this case appears strikingly similar to *State v. Gardner*, 311 N.C. 489, 319 S.E.2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985), in which the defendant committed an after-hours robbery and murder at a Steak and Ale restaurant in Winston-Salem. Gardner gained entry by ringing the doorbell after the restaurant had closed and forced his way in when a bartender answered the door. Once inside, he fatally shot a management trainee and the bartender, then escaped with the day's receipts.

The jury found the aggravating circumstances that the capital felony was committed for pecuniary gain and that the murder was part of a course of conduct involving the use of violence against another person. The jury also found the mitigating circumstances that defendant's prior family history would reasonably be expected to contribute to the crime and that his drug and alcohol addiction or abuse would reasonably be expected to contribute to the defendant's criminal conduct. In affirming the sentence of death, this

**STATE v. ROBINSON**

[336 N.C. 78 (1994)]

Court characterized the murders as "part of a violent course of conduct, and were coldblooded, calculated, and senseless." *Id.* at 514, 319 S.E.2d at 607.

Noteworthy dissimilarities between *Gardner* and the present case only serve to reinforce our determination that the sentence of death in this case is not disproportionate. Unlike defendant here, Gardner confessed to the killings and said that he had shot the first victim because he thought he may have had a weapon in his hand. He also stated "that he and his companion had been injecting 'crystal meth' into their arms earlier that evening." *Id.* at 495, 319 S.E.2d at 596.

In contrast, defendant in the present case never acknowledged his part in the murders. There was no evidence whatsoever of any provocation or threat to defendant on the part of the victims. The most pertinent references to drug use on the day of the murders concerned defendant's purposeful abstention in preparation for his crime and his later gleeful injection of cocaine purchased with the stolen money.

We hold that the sentence of death in this case is not disproportionate and decline to set aside the death penalty imposed.

In summary, we have carefully reviewed the transcript of this sentencing proceeding as well as the record, briefs, and oral arguments of counsel. We have addressed all of defendant's assignments of error and conclude that defendant received a fair sentencing proceeding free from prejudicial error before an impartial judge and jury. The convictions and the aggravating circumstances are fully supported by the evidence. The sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor and is not disproportionate.

NO ERROR.